DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the judgment of the Wood County Court of Common Pleas which, following a jury trial, found appellant, Jeffrey Thomas, guilty of Count 1 of the indictment, gross sexual imposition, in violation of R.C. 2907.05(A)(4), a felony of the third degree, and Count 5 of the indictment, rape, in violation of R.C.2907.02(A)(1)(b) and (A)(2), a felony of the first degree. Appellant *Page 2 
was found not guilty as to the three remaining counts of rape set forth in the indictment. On January 31, 2006,[1] appellant was sentenced to two years incarceration for the gross sexual imposition conviction and seven years for the rape conviction, to be served concurrently, was fined $10,000, and was found to be a sexually oriented offender. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} The victim in this case was appellant's step-daughter, who was less than 13 years of age at the time the offenses were committed. On appeal, appellant raises the following assignments of error:
 {¶ 3} "1. The trial court erred to the prejudice of appellant and denied his right to due process and a fair trial in not granting the Rule 29 motions for judgment of acquittal as to all counts of the indictment at the end of the state's case and after the verdict was announced.
 {¶ 4} "2. Thomas was denied his right to due process and a fair trial because the state failed to disclose two DVDs of the victims statements and medical records after being served with an appropriate request for discovery prior to the trial in violation of Crim.R. 16.
 {¶ 5} "3. Cumulative errors committed in this trial, even if individually insufficient to constitute reversible error, in the aggregate, deprived appellant his fundamental right to due process and fair trial.
 {¶ 6} "4. The court showed bias and prejudice against the defendant by taking *Page 3 
him into custody during his closing arguments in the presence of the jury which constituted misconduct by the court and was prejudicial to the defendant since it tended to and did influence the jury adversely against the defendant."
 {¶ 7} Appellant argues in his first assignment of error that the evidence was insufficient to sustain a conviction of gross sexual imposition and rape. Appellant, who represented himself at trial, argues that the state failed to establish the elements of the offenses based upon the following: (1) the victim's testimony regarding the number and location of the alleged incidents was inconsistent; (2) Dr. Randall Schlievert's examination of the victim's genitals was normal, including her labia, hymen and surrounding tissues; and (3) Dr. Wayne Graves testified that the victim was being treated for Attention Deficit Hyperactivity Disorder ("ADHD"), and that it is not unusual for children diagnosed with ADHD to have difficulty interpreting what is real and make sense of it, and are sometimes less truthful.
 {¶ 8} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. As such, the issue to be determined with respect to a motion for acquittal is whether there was sufficient evidence to support the conviction. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. State v. Thompkins (1997),78 Ohio St.3d 380, 386. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the *Page 4 
essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 9} Regarding the offense of gross sexual imposition, R.C.2907.05(A)(4) states that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." With respect to the charge of rape, R.C. 2907.02(A)(1)(b) states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Also, R.C. 2907.02(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."
 {¶ 10} In this case, the victim, who was born August 24, 1993, testified that approximately one month prior to her mother marrying appellant, which occurred in June 2002, appellant began touching the victim's vagina underneath her clothing. The victim testified that on numerous occasions from that time until October 2004, when the victim *Page 5 
finally disclosed appellant's conduct to her mother, appellant would put his mouth on her vagina, make her put her mouth on his penis, make her stroke his penis with her hand, put his fingers inside of her, and touch her chest under her shirt. Although the victim would have been nine-years-old at the time of the wedding, she also testified that she was eight-years-old when the abuse began, and stated that the abuse occurred for a period of three years.
 {¶ 11} The victim testified that appellant hurt her when he stuck his fingers in her. She testified that appellant never put anything else inside her vagina and that appellant told her that she was too small for him to put his penis inside of her. She also testified that, on one occasion, white stuff came out of appellant's penis onto her stomach. The victim stated that appellant had a large mole under his penis, which was verified by the victim's mother. The victim disclosed to authorities that abuse had occurred when her mother was gone to play softball.
 {¶ 12} On cross-examination, the victim testified that she could not recall precise dates, but knew that appellant digitally penetrated her five to ten times and engaged in oral contact with her five to ten times. She testified that the abuse took place in her room. However, when questioned further by appellant, the victim also testified that two incidents occurred in appellant's room. When questioned by appellant why, prior to trial, she had disclosed fewer incidents to her father, the police, the prosecutor, and two social workers, the victim replied that she was eventually able to remember all the incidents by "[b]eing able to talk about it more." *Page 6 
 {¶ 13} The victim testified that she did not disclose the abuse until after her mom told appellant during a fight, on October 8, 2004, to move out and that the marriage was over. According to the victim, during the abuse, appellant had told her not to tell her mother about his conduct. Additionally, the victim testified that she did not disclose the conduct earlier because she did not want to upset her mother, who seemed happy with appellant; she was embarrassed; and she was afraid that her biological father would be mad at her.
 {¶ 14} The victim's mother, Tracy Thomas, testified that appellant moved in with her in May 2000. She testified that appellant was home most of the time because he worked out of the home, and that she worked during the week and on Saturdays. She also testified that she played softball on Sundays. On Sundays, she would typically leave home early to warm-up and then her children and appellant would come later to see the games. The children could ride their bikes to the field which was a short distance from their home.
 {¶ 15} Tracy described the victim as a "very sincere person" who was taught to be respectful. Tracy testified, however, that the victim was openly argumentative with appellant and stated that she did not like him. Tracy testified that she could tell the victim attempted to appease her mother's wishes by being respectful, but that appellant often "nitpicked" at the victim.
 {¶ 16} On October 8, 2004, during a trip to North Carolina, appellant, Tracy, the victim, and the victim's friend stopped for gasoline in Kentucky. Tracy was inside and *Page 7 
asked the victim to get her purse from the car. Appellant objected to the victim taking the purse because of the amount of money in it and began screaming obscenities at the victim. The family turned around and went home to Perrysburg, Ohio. Tracy testified that she argued with appellant during the ride home, and that "it was the most horrific verbal abuse I've ever been through in my life." Tracy stated that she knew the marriage was over. She dropped appellant at home and told him to get his stuff and leave. She and the children stayed the night in a hotel and joined the victim's grandfather in Canton, Ohio the following day.
 {¶ 17} While in Canton, the victim disclosed to her mother that appellant had tried to touch her. Tracy and the victim were not in a place where they could talk, so Tracy merely told the victim that she did the right thing by telling and that "he's out of the house, he's never coming in this house again." Tracy testified that on Sunday, after the disclosure, she called appellant and said, "she told me what you tried to do you pervert, you this, you that and I want you to know you're out of my house, you're out of my life and I need my money back that you borrowed from me," which was $13,000.
 {¶ 18} Tracy testified that when they returned home on Monday, she called appellant repeatedly to yell at him. She stated that the victim then approached her and told her that appellant had not just tried to touch her, but that he had "done a lot of things to her." Tracy questioned the victim further about the extent of the touching, determining that it had been going on for at least two years. Tracy then calmed the victim down, got her to bed, and called the police at 10:30 that evening. Tracy took the victim to the police *Page 8 
station the following day. Tracy testified that she was aware that the victim disclosed more details to the police and her dad, than she had told Tracy.
 {¶ 19} Tracy testified that during the two years of her marriage to appellant, the victim was very unfocused in school, anxious and depressed. She testified that the victim's doctor suggested that the victim was suffering from ADD or ADHD and prescribed medicine for those conditions. According to Tracy, she took the victim off the medication after trying each for a few days because the victim became more depressed and cried more often when on the medication. In 2005, Tracy testified that the victim was again receiving all A's and B's in school. Tracy also testified that during her marriage to appellant, the victim began wetting her bed again. The victim had been on medication for bedwetting since she was five or six-years-old, but until Tracy's marriage to appellant, the medication had been effective at preventing bedwetting. Tracy testified that even while the victim was medicated, she suffered severe bedwetting between 2000 and 2004. After October 2004, Tracy testified that the victim's incidents of bedwetting improved.
 {¶ 20} Maggie Collins, elementary school counselor at Perrysburg Schools, testified that she met with the victim and her mother during the 2002-2003 school year, when the victim was in the third grade. Collins testified that the victim was having a harder time paying attention, her grades went down a little, and she was having issues with self-confidence, feeling ugly and uncomfortable with herself. The victim was having stomach aches and did not want to go to school. Collins further testified that *Page 9 
during her fifth grade year, the victim's "confidence level was up and * ** she was adjusting and doing better." After seeing her in the fall of 2005, Collins stated that the victim "seemed like * * * she got over some of the hurdles that she had in her third grade year." On cross-examination, Collins testified that she knew that victim was having some conflicts at school, but did not know that she was being "terrorized or bullied," as suggested by appellant.
 {¶ 21} Mark Baumgardner, a Perrysburg police officer, testified that he interviewed the victim on October 12, and October 15, 2004. Baumgardner testified that, during the initial interview, the victim described incidents where appellant had touched her on her private parts, above and beneath her clothing, touched her chest, and asked her to touch his penis. During the October 15, 2004 interview, Jamie Colatruglio, investigator of child abuse and neglect for the Wood County Department of Job and Family Services, was also present. Baumgardner testified that, during the second interview, the victim described two incidents where appellant put his penis into her mouth, placed his mouth on her vagina, and touched her on her private parts. On cross-examination, Baumgardner disagreed with appellant that the victim's statements were inconsistent; rather, Baumgardner testified that he felt, at different times, more information came out.
 {¶ 22} Jamie Colatruglio testified that she met with the victim three times. Colatruglio testified that the victim was "very emotional" when speaking with her, "seemed very genuinely devastated," and "was embarrassed at times to talk about some of *Page 10 
the things that had happened to her." Colatruglio described the process of progressive disclosure, whereby child victims withhold information during the initial interview. Colatruglio stated that "[i]t may take a child more than one time speaking with someone to share the allegations in their entirety" because "[s]ome children come in and disclose a few of the details and then shut down." She also stated that children are sometimes afraid of how the parent and interviewer will react, are embarrassed, and can be fearful of repercussions. Children can be concerned about what will be done with the information they provide and tend to feel more comfortable the more they meet with the interviewer. Thus, Colatruglio testified that it often "takes them several times to feel comfortable enough to share everything."
 {¶ 23} When speaking with the victim in this case, Colatruglio stated that, initially, the victim only said that touching had occurred. In additional interviews, the victim disclosed oral sex and digital penetration by appellant. On cross-examination, Colatruglio testified that the victim's disclosures were not inconsistent, that she never wavered from the initial incidents she described, but that she did reveal more information about the incidents as the interviews progressed. Regarding the specifics of the incidents, Colatruglio testified that the victim disclosed, during separate interviews, that at one incident, nothing came out of appellant's penis, but at another incident, a white substance came out. Colatruglio stated that these were separate incidents being described by the victim and that her statements were not contradictory. Colatruglio stated that when asked why she did not disclose all the details of the abuse during their first meeting, the victim *Page 11 
responded that she "was afraid."
 {¶ 24} Concerning other potentially inconsistent statements by the victim, on December 13, 2004, the Children's Mercy Hospital report indicated that the victim denied ever seeing anything on appellant's "private parts." However, during a later interview with a prosecutor, when asked to draw appellant's penis, the victim drew in "the mole" located beneath his penis.
 {¶ 25} John Helm, investigator for the Wood County's Prosecutor's Office, testified that based on his training, children typically do not disclose sexual abuse when it occurs, particularly when the abuser lives with the child. Helm testified that children "kind of test the water and begin with something maybe low level or fairly innocuous, to see how people are going to react and see if the sky is going to fall on them when they tell." Helm stated that children will progressively bring out more and more as they become more comfortable and they understand bad things are not going to happen. Helm did not find the victim's accounts to be inconsistent, but, rather, that they were "within the bounds of reasonable for a child of that age recounting events that happened a couple years ago or as long as a couple years ago." Helm additionally stated that it would be "pretty difficult" for an eight to ten-year-old child to maintain a coached story throughout successive interviews. Helm testified that, unlike the victim's interviews, typically when reciting a coached story, if a child is interrupted, "they almost have to go over and tell it again" from the beginning.
 {¶ 26} Dr. Randall Scott Schlievert, a pediatrician through Medical University of *Page 12 
Ohio and director of the child maltreatment division, examined the victim. Dr. Schlievert found the victim's genital exam to be normal, including her labia, hymen and surrounding tissues. Dr. Schlievert testified that these findings do not prove or disprove that the victim was digitally penetrated, but stated that the findings were consistent with the victim's testimony that no penile penetration occurred. Dr. Schlievert testified that there can be digital penetration without injury occurring to the hymen or surrounding tissue. Based on his studies, Dr. Schlievert testified that 95 to 98 percent of girls who have had penetration, including digital penetration, will have a normal exam if they are not examined within 72 hours of the incident. His studies also demonstrated that even when a hymen is torn, over time it can heal to the point that it looks normal when examined at a later date.
 {¶ 27} Appellant questioned Dr. Schlievert regarding the victim's medical records, which indicated that she cried over little things and was treated for ADHD. Dr. Schlievert testified that during her time with him "there were no other signs of behavior problems or acting out or doing anything more than seeming to be a sad and upset person." With respect to the victim's tendency to cry, Dr. Schlievert testified that "crying for any reason can happen" and that people with or without mental illness "cry for various reasons." He noted, however, that while the victim was in his office, she did not cry all the time and, although she cried while disclosing the abuse, "[s]he seemed to cry at appropriate times." Dr. Schlievert also testified that there is a higher rate of behavior problems of children who have been abused, including bedwetting. *Page 13 
 {¶ 28} Dr. Wayne Graves, a clinical and forensic psychologist, testified on appellant's behalf Dr. Graves never personally evaluated the victim, but reviewed her pediatrician's notes regarding her treatment. Dr. Graves testified that the victim was treated in May 2003 for ADHD. Conditions of ADHD can include inability to pay attention, which effects the child's ability to learn, remember, or achieve well in school; hyperactivity, heightened energy activity level, an inability to sit still and focus, need to move around often and can include impulsive behavior; and trouble with sleeping and waking. Dr. Graves testified that there appears to be a strong genetic component to ADHD and bipolar disorder. Thus, in investigating abuse, Dr. Graves testified that it might be relevant to know if the child's parents are bipolar.
 {¶ 29} Dr. Graves testified that behavioral problems for children with ADHD includes "being disrespectful, lying, having trouble with authority, being rebellious." ADHD behavioral indicators can also include "acting inappropriate sexually and having anger or aggressive issues." He also testified that children with ADHD "are sometimes less truthful" because they tend to get in more trouble and have more difficulty with the world, causing them to have to explain their behavior, which can create a "tendency for them to lie more." Dr. Graves also testified that ADHD children do not plan ahead very well and therefore often appear not to have used good judgment. He further testified that ADHD is not a condition whereby the children are unable to interpret reality; however, he noted that it is "not unusual for ADHD children to have difficulty interpreting what's real, to make sense of it." *Page 14 
 {¶ 30} With respect to progressive disclosure in sexual abuse cases, Dr. Graves testified that as children become more comfortable with the reactions of the individual to whom they are reporting, they can provide some more detail regarding the abuse. Dr. Graves testified that providing consistent accounts of what occurred could demonstrate that the child was being more truthful and that inconsistencies could suggest untruthful behavior.
 {¶ 31} On cross-examination, Dr. Graves testified that children who are sexually abused frequently are depressed, anxious, have mood swings, are unable to focus, have behavioral problems, act out, and display inappropriate sexual behavior. Dr. Graves also testified that "[i]f the perpetrator of the sexual abuse is in the same context as the child, we would expect the child to have more psychological distress and difficulty and then probably more acting out." However, one cannot assume that a child exhibiting these tendencies is abused.
 {¶ 32} Dr. Graves further testified that ADHD can be misdiagnosed when a child is actually suffering from sexual abuse, trauma or some other stressor. When the stressor is removed, if the symptoms disappear, such as depression, anxiety, mood swings, inability to focus, then it would suggest that ADHD may not have been present because the condition of ADHD is a consistent neurobiological condition.
 {¶ 33} Regarding an ADHD child's ability to recall events correctly, Dr. Graves testified on cross-examination that not all children with ADHD are unable to recall correctly; rather, "[w]e're talking about some defects in recall sometimes." Dr. Graves *Page 15 
stated that "it depends a lot on the circumstances" being recalled, and that even children with ADHD can be reliable with respect to their ability to recount events. Dr. Graves also stated:
 {¶ 34} "[Children's memory is not as organized as adults. And it is not unusual for a child to say things about something that's happened and to not report the same things entirely each time. We do listen to the level of consistency that's present; but there are a lot of things that affect how and what they say including the questions that they get asked because children are asked questions in a variety of ways."
 {¶ 35} We find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes of rape and gross sexual imposition proven beyond a reasonable doubt. The victim made progressive disclosures of abuse, but her accounts were not inconsistent. The victim clearly established that appellant engaged in sexual conduct with her between 2000 and 2004. Also, because her issues with being able to focus and acting out improved after appellant left the victim's home, the jury reasonably could have concluded that the victim did not suffer from ADHD, but was instead responding to the abuse. As such, we find that the trial court did not abuse its discretion in denying appellant's motion for judgment of acquittal, pursuant to Crim.R. 29. Appellant's first assignment of error is therefore found not well-taken.
 {¶ 36} Appellant argues in his second assignment of error that he was denied his right to due process and a fair trial because he was denied access to certain medical *Page 16 
records and two DVD's of the victim's interviews with Baumgardner, on October 12, 2004, and Baumgardner and Colatruglio, on October 15, 2004.
 {¶ 37} The granting or denial of discovery motions rests within the sound discretion of the trial court. State v. Craft,149 Ohio App.3d 176, 2002-Ohio-4481, ¶ 10. An abuse of discretion implies that the court's decision was not merely an error of law or judgment, but was unreasonable, arbitrary, unconscionable, and clearly against reason and evidence. State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130. Crim.R. 16(A)(1)(f) requires the state to disclose, upon request, "all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment."
 {¶ 38} Failure to disclose evidence favorable to an accused violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." State v. Johnston (1988), 39 Ohio St.3d 48, paragraph four of the syllabus, citing Brady v. Maryland (1963), 373 U.S. 83, 87. Evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at paragraph five of the syllabus, citing United States v. Bagley (1985), 473 U.S. 667, 682. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "Prosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and *Page 17 
(3) the accused suffered prejudice." State v. Jackson,107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 131, citing, State v. Parson (1983),6 Ohio St.3d 442, 445.
 {¶ 39} On July 5, 2005, appellant requested the following medical records be provided by Tracy Thomas: "All documents submitted by you, to a doctor which specifically contain peculiar traits, or symptoms for diagnosis and treatment of a behavioral disorder affecting the child involved in [this case]. To include, doctor's name, address, diagnosis, medication prescribed, dates medication administered for condition." During a pretrial on November 1, 2005, appellant stated that he had not received the medical records he requested. The prosecutor indicated that Tracy possessed the records and the trial court ordered them to be provided to appellant within one week. The victim's pediatric records regarding potential ADHD or ADD diagnosis and treatment were used by appellant during the course of the trial.
 {¶ 40} During trial, appellant questioned Tracy regarding the medical records she allegedly failed to produce in accordance with the July 5, 2005 subpoena. Tracy responded, "I got what I thought I needed, which was one page of with [sic] the ADD and all that. I didn't realize how much that was needed. [The prosecutor] never told me to get from 2001 on. Once I was told that * * *, I got it. I got what I was told to do." Appellant asked why Tracy did not provide the documents she and the school submitted to the doctor for diagnosis and treatment of ADD or ADHD. Tracy responded, "There is no paper like that that you're asking for. It does not exist. That paper does not exist anymore. I can't give you something that doesn't exist. * * * She wasn't diagnosed with *Page 18 
ADD, so obviously they got rid of it. I never got it back. The doctor's office doesn't have it. And I'm told if they're not diagnosed with ADD, then they discarded it. The only way they keep it is if they're diagnosed."
 {¶ 41} Based on the evidence in this case, we find that appellant failed to establish that the alleged medical records were favorable to appellant and material to his guilt; still in existence; or that there was a reasonable probability that the outcome of the trial was undermined. Accordingly, we find that appellant's due process rights were not violated with respect to the state's failure to disclose the victim's alleged medical records.
 {¶ 42} Appellant additionally argues that he was denied due process because of the state's failure to provide him with two DVDs of the victim's interviews with Baumgardner, on October 12, 2004, and Baumgardner and Colatruglio, on October 15, 2004. The interviews were not transcribed, but were summarized in written reports, prepared by Baumgardner and Colatruglio, and provided to appellant. Upon review of the record, and contrary to appellant's assertion, it is clear that appellant was aware that the victim's interviews with the authorities had occurred and had been recorded. Appellant argued that he needed to have the DVDs to determine if there were any inconsistencies between the recorded interviews, the written reports, and the victim's testimony.
 {¶ 43} The trial court reviewed the recordings in camera to determine if there were any inconsistencies. The trial court stated that it reviewed a "good portion" of the October 12, 2004 interview and "a little" of the October 15, 2004 interview, and found *Page 19 
that "[t]he audio part is hard to hear," but that he "hadn't heard anything inconsistent." The trial court stated that the victim provided more detail on the DVDs than she went through on the stand, but that did not mean her statements and testimony were necessarily inconsistent. Although appellant denied ever having the DVDs of the victim's interviews, the trial court noted that appellant's previous counsel, T. Hamilton Noll, had access to the disks and made copies of them. However, because it appeared that the DVDs were not made available to appellant during discovery, the trial court allowed appellant "some leeway to cross-examine" the victim with use of the reports that he was given.
 {¶ 44} We find that appellant was not denied his due process rights by not receiving the DVDs of the victim's interviews. Appellant was aware of the interviews with the victim, knew they had been recorded, and received the written reports generated from those interviews. The trial court allowed appellant great latitude in using Baumgardner's report during cross-examination in an attempt to demonstrate inconsistencies with the victim's statements and testimony. Additionally, we have thoroughly reviewed the DVDs from start to finish, find no inconsistencies within the interviews themselves, and find no inconsistencies with the DVDs and any written report, or any trial testimony. As such, we find that appellant did not establish that the prosecution failed to disclose the existence or content of the DVDs, that they were favorable to his case and material to his guilt or punishment, or that there was a reasonable probability that, had appellant received the DVDs, the result of the proceeding would have been different. Accordingly, having found no prejudice to appellant, we find *Page 20 
that the trial court did not abuse its discretion by withholding the DVDs. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 45} In his third assignment of error, appellant argues that the cumulative errors committed during trial, even if individually insufficient to constitute reversible error, in the aggregate, deprived appellant his fundamental right to due process and fair trial. Specifically, appellant argues that the following matters were erroneous: (1) he could not view the DVDs of the victim's interviews; (2) he did not receive the victim's medical records he subpoenaed, which prohibited him from advancing "his theory the indictment was brought about because he didn't deliver on [Tracy's] extortion threat," where she sought $13,000; (3) Tracy was never held in contempt for failing to produce the subpoenaed medical records, or found guilty of perjury; (4) the victim was found competent to testify; and (5) appellant was not permitted access to the medical records of the victim's biological father, which may have shown that he suffered from a bipolar disorder.
 {¶ 46} In order to establish a reversible cumulative effect of error, appellant must first show that multiple errors were committed. SeeState v. Madrigal (2000), 87 Ohio St.3d 378, 398. We, however, find no error with respect to the matters raised by appellant. We have already found that there was no error or prejudice to appellant regarding the production of the DVDs. We also found no error with respect to Tracy's failure to produce certain medical records. As such, there was no basis for the trial court to hold Tracy in contempt for failing to provide those medical records. Moreover, we fail *Page 21 
to see how the victim's medical records have any connection to appellant's theory that Tracy was attempting to extort money from him. We also fail to see how Tracy being held in contempt, for failing to supply medical records, would have changed the outcome of appellant's convictions. Regardless, we find that Tracy could not have been found guilty of perjury during appellant's rape and gross sexual imposition trial.
 {¶ 47} Although appellant states that the victim was found competent to testify, he fails to assert any grounds for error in this regard. Appellant argued at length during trial that the victim was ADHD, that she likely inherited it from her biological father, who may have a bipolar disorder, and that her testimony was therefore unreliable. We, however, find that determining whether the victim's father suffered from a bipolar disorder would not have conclusively established that the victim suffered from ADHD, or that her testimony was not credible. As such, we find that the father's medical records were a tangential issue, not relevant to the issue of appellant's guilt, and that the trial court properly denied appellant's request for the father's medical records.
 {¶ 48} Having found no error, harmless or otherwise, we find that appellant was not prejudiced by cumulative error. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 49} Appellant argues in his fourth assignment of error that he was prejudiced by the trial court's showing of bias and prejudice against him when the trial court took appellant into custody during his closing arguments. We disagree. *Page 22 
 {¶ 50} In preparing for closing argument, the trial court specifically instructed appellant and the prosecutor that there would be "30 to 40 minutes max per side." During appellant's closing argument, the trial court gave appellant a warning that his time was ending and that he "might want to start wrapping it up." Several pages of transcript later, the trial court again told appellant to "wrap up." A page later, he was told two more times to "wrap things up" and that he was "repeating" himself. With each warning, appellant assured the trial court that we was trying to go as quickly as he could. Two more pages of argument, and appellant told the trial court he was almost done. The trial court gave appellant a one minute warning and told him to "just conclude." When appellant continued with repetitive argument, the trial court stated: "You've already brought that up, Mr. Thomas. It's time to wrap up. Just sit down, Mr. Thomas." Appellant stated he had just one more paragraph go, to which the trial court responded, "You've said that five times. Mr. Thomas, sit down. Bailiff. Step away from the jury. Constable, take the defendant into custody." At that point, appellant agreed to sit down.
 {¶ 51} Appellant requested a mistrial due to the "irregularity demonstrated by the court in front of the jury," but his motion was denied. The prosecutor then suggested, "in the interest of justice, the state would not object to the court, if the defendant can restrain himself, allowing him five more minutes to finish up his closing argument." The trial court granted this request and, after a short recess, both sides were given five additional minutes to finish their arguments. *Page 23 
 {¶ 52} At the conclusion of all closing arguments, the trial court made the following statement to the jury:
 {¶ 53} "* * * Before I give you the instructions of law by the court, first of all, I want to apologize to Mr. Thomas and the prosecutor and the jury for my losing patience with Mr. Thomas. The court is used to when we say to stop, I'm used to people stopping. So I don't think Mr. Thomas, being new to this, understands the rules. So I don't want you to hold that against him and I certainly don't want it to impact on your decision.
 {¶ 54} "If during the course of the trial I have given an indication that I favor one side or the other, I want you to totally disregard it because it's not true. It's not true at all. So I want you to disregard any indication given during the course of trial, it would have always fell into that category of just not necessarily understanding court procedures. So with that said, I'm going to proceed to give you the jury instructions by the court."
 {¶ 55} This statement by the trial court was consistent with the instructions and admonitions provided to the jury early in the trial, such as:
 {¶ 56} "Ladies and gentlemen, again, I am going to add another admonition, please disregard our sidebar conversations. Mr. Thomas is pro se. He's not an attorney. He doesn't understand the rules. If it appears that we're constantly at this kind of a situation it's only because as we go along here it's making it a little difficult. Attorneys would understand where they can go and where they can't go. So please do not feel the court is trying to pick on Mr. Thomas or siding with one side or the other. I am remaining impartial. I wish you [to] do the same. And if anything creates an otherwise impression, *Page 24 
I want you to please put that aside. That is not occurring. But yet I have a responsibility to keep this trial within the rules."
 {¶ 57} Also, immediately prior to closing arguments, the trial court stated:
 {¶ 58} "If during the course of the trial, another point that I want to bring up, there were moments of frustration or any irritation on my part towards any of the parties, particularly the defendant, I want you to disregard that. It was more as to his not being an attorney and the frustration of that. We usually have attorneys on both sides who understand the rules and that, and if I conveyed any dissatisfaction, I didn't intend to, but if I conveyed any dissatisfaction in that area I want you to disregard that as well."
 {¶ 59} R.C. 2945.03 charges a trial judge with the duty of controlling the criminal trial:
 {¶ 60} "The judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue."
 {¶ 61} In exercising this duty, the Ohio Supreme Court has stated that "the judge must be cognizant of the effect of his comments upon the jury." State v. Wade (1978), 53 Ohio St.2d 182, 187, reversed on other grounds Wade v. Ohio (1978), 438 U.S. 911. Although there is "no absolute prohibition" precluding comment by a court during trial, it must "be borne in mind that `* * * the influence of the trial judge on the jury is necessarily and properly of great weight * * *.' [Citation omitted.]" Wade at 187, citing *Page 25 State v. Thomas (1973), 36 Ohio St.2d 68, 71. Noting that certain improper remarks by the trial judge may prejudice a defendant's rights, the Ohio Supreme Court has held that "in determining whether a trial judge's remarks were prejudicial, the courts will adhere to the following rules: (1) the burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel." Wade at 188.
 {¶ 62} In this case, the trial court did not threaten appellant with being taken into custody until after he had been asked five times to "wrap up" his closing arguments, which had already exceeded the allotted time. Appellant, however, was never actually taken into custody and, in fact, was given additional time to make his concluding arguments. The trial court repeatedly admonished the jury throughout the trial not to infer any bias or impartiality by the trial court as to appellant and issued a curative instruction. Also, when apologizing to all parties and the jury, the trial court offered appellant's pro se status as reason for appellant's apparent failure to abide by the court rules.
 {¶ 63} Undoubtedly the trial court could have chosen a different course in attempting to control appellant's repetitive and lengthy closing arguments. However, a jury is presumed to follow the trial court's curative instructions. State v. Loza (1994), *Page 26 71 Ohio St.3d 61, 75. Given the repetitive admonitions to the jury and weight of the evidence introduced at trial, which supports the jury's guilty verdict, we find that appellant was not prejudiced by the trial court's actions. Appellant's fourth assignment of error is therefore found not well-taken.
 {¶ 64} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., Thomas J. Osowik, J., George M. Glasser, J. Concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] Judgment entry was journalized on February 7, 2006. 2. *Page 1