[Cite as *State v. Heiney*, 2018-Ohio-3408.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-16-1042

    Appellee                                    Trial Court No. CR0201502287

v.

Jake Paul Heiney                              **DECISION AND JUDGMENT**

    Appellant                                   Decided:  August 24, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Deborah K. Rump, for appellant.

* * * * *

**MAYLE, P.J.**

### Introduction

{¶ 1} The defendant-appellant, Jake Paul Heiney, appeals the February 29, 2016

judgment of conviction finding him guilty of two counts of gross sexual imposition and

one count of tampering with records.  The Lucas County Court of Common Pleas sentenced him to 180 days in jail, 90 days in the county work release program, fined him $5,000, and designated him a Tier 1 sex offender.  For the following reasons, we affirm.

## Background

{¶ 2} Heiney is an orthopedic surgeon who ran his own medical practice, called Cutting Edge Orthopedics.  He operated two offices, one in Sylvania, Ohio, and the other in Lambertville, Michigan.  In this case, Heiney is alleged to have touched two female patients inappropriately while examining them at his Sylvania office in early 2015.  The patients, referred to as "M.S." and "K.O.," offered the following testimony at trial.

## M.S.

{¶ 3} M.S., a 42-year-old woman, first treated with Heiney in 2010.  In 2014, she returned to Heiney with complaints of left shoulder pain and weakness.  M.S. treated with Heiney a total of four times for left shoulder pain.  The pain was localized to her left shoulder; it did not radiate to her chest, breast area, or any other area.  The first two appointments were uneventful.

{¶ 4} M.S.'s third appointment occurred on January 8, 2015.  Heiney examined M.S. with the door closed but unlocked; no one else was in the room at the time.  M.S. was wearing a tank top with thin straps and a bra, and she was seated at the exam table.  Heiney asked if he could pull the straps down so that he could examine her shoulder, and M.S. said, "Okay."  While preparing to give M.S. an injection, Heiney explained that he would put gauze inside her bra because he "didn't [want to] get anything on [her] pretty pink bra."  M.S. "tried to ignore" and "blow off" the comment, although it "felt weird."

2.

According to M.S., Heiney then "pulled out the cup of my bra and he * * * tucked [the gauze] like all the way underneath my breast, and the back of his hand was brushing my breast as he kept tucking [the gauze] down." Heiney gave M.S. the injection.

{¶ 5} According to the indictment, the alleged criminal conduct occurred during M.S.'s fourth and final appointment on February 12, 2015. M.S. complained of "progressively * * * worse" shoulder pain, although still localized to the shoulder. During the exam, M.S. sat upright on the exam table. She testified that Heiney "asked if it was okay * * * to take my arm out of my shirt this time." At the last appointment, Heiney had only sought permission to lower the straps of her bra and tank top. M.S. said, "okay" because, as she explained, "I was having so much pain, and I couldn't do my job. I just wanted to feel better." Heiney helped M.S. pull her arm out of her shirt, and then examined her left bicep by placing pressure on her arm with his hands. M.S. experienced discomfort to her bicep because he "press[ed] so hard for so long." Heiney told her that pain from her breast can radiate to the arm, and he asked to perform a "breast exam," to which she agreed. According to M.S., Heiney pulled the cup of her bra down, which completely exposed her breast. He "pushed on my breast all over the top and underneath and then he squeezed it between his fingers, and he pushed on it some more." While examining her breast, Heiney asked if it hurt, and M.S. said "no." She testified, "I didn't have any pain * * * because [my breast] wasn't hurting me to begin with." M.S. felt "uncomfortable" and "pretend[ed to be] somewhere else."

3.

**{¶ 6}** Heiney then examined her neck, and they discussed the fact that M.S. was also experiencing headaches. Next, Heiney asked to examine M.S.'s breast again, which he did by "push[ing] on it a couple times." He then prepared to give M.S. an injection in her arm. Heiney, again, pulled the cup of her bra away from her body, and placed a piece of gauze "deep inside the bra under [her] breast." He also commented that "women always [wear] white bras to the doctor." No one was in the office at the time, and M.S. does not recall that Heiney wore gloves during his examination of her.

**{¶ 7}** After her appointment, M.S. felt "embarrassed * * * angry [and] ashamed." She did not return for further treatment. Two weeks later, M.S. requested and received her medical chart from Heiney's office.

**{¶ 8}** M.S. then sought treatment from Dr. Christopher Foetisch, also an orthopedic surgeon, who told her that her shoulder was dislocating and needed surgery. They also discussed how Dr. Foetisch conducts physical exams, and based on that conversation as well as her own feelings, M.S. concluded that Heiney's conduct had been improper.

**{¶ 9}** M.S. filed a complaint against Heiney with the State Medical Board of Ohio ("SMBO") on April 1, 2015. In it, M.S. complained of "sexual misconduct" and "inappropriate" conduct by Heiney during the January 8, 2015 and February 12, 2015 appointments. Under cross-examination, M.S. denied that Heiney made any inappropriate comments to her, and she did not think that Heiney had an erection during his examination of her.

4.

## K.O.

{¶ 10} K.O., a 33-year-old woman, treated with Heiney on one occasion, March 12, 2015. She complained of left-sided pain in her shoulder, low back, and hip. K.O. reported that the pain radiated down her left arm, into her hand and "occasionally" into her buttock, all the way down her leg into her knee. K.O. met with Heiney in an exam room. No one else was present. During the first part of the exam, Heiney manipulated her left arm in different positions, asking if the movements caused any pain. As described by K.O.:

> And then he * * * asked me if I was experiencing any discharge from my breast, and I said no. So he told me to take * * * my arm out of my sleeve and my bra strap as well, and then he held my arm like this with his one hand and with the other hand he pulled my bra down, and then gave me a breast exam and asked me if I had any pain, which I said no. And then he held my arm in a different positon and then gave me a second breast exam, the whole time when my bra had been down at this point, and then he pulled my bra back up and held my arm in a couple different positons asking me, * * * ["]does this hurt, does this hurt["] and feeling around in my arm. And then * * * a third time he pulled my bra down again, said ["]one more time["], and gave me a third breast exam.

{¶ 11} K.O. described his palpation of her breast as "padding of his fingers and just going around," but during his third examination, he "cupped" her breast.

{¶ 12} K.O. momentarily left the exam room so that an x-ray could be taken of her neck. When she returned, Heiney examined her low back. K.O. described the examination:

I was facing him and he was feeling a little bit [of] my hip * * * and asking me what hurt and where. And then he asked me to turn around and face the table and touch my toes, so I did. At that point he grabbed my pants and my underwear and pulled them down to right above my knees, and then started to feel around on my behind and on my side and in my upper thigh region where his fingers kind of brushed against my private area.

{¶ 13} When asked to elaborate, K.O. testified that while he was "grabbing the inner part of the thigh and the lower part of the butt" with his hand, Heiney's fingers brushed up against her genitalia. K.O. said that she was "extremely" surprised when Heiney pulled down her pants and that he gave her no warning that he was going to do so, nor did he give her any explanation as to why it was necessary. With K.O. still bent over, Heiney asked her if she could bend over any farther. When she said that she could not, he stopped touching her, and K.O. "grabbed my pants and stood up quick to pull them up." Heiney announced, "well, I'm done." K.O. testified that Heiney was not wearing gloves.

{¶ 14} After the appointment, K.O. prepared a typed-written statement of what had occurred. K.O. did not mention that Heiney had brushed his hand by her vaginal area or "cupped" her breast because, she testified, she did not know how detailed the

6.

statement should be and because she was "extremely" embarrassed. Two days after the incident, K.O. reported Heiney's conduct to the Toledo Police, which redirected her to the Sylvania Police Department because the incident occurred in Sylvania. On March 15, 2015, now three days after her appointment, K.O. met with the Sylvania Police and signed the statement.

## The Investigation

{¶ 15} K.O.'s case was assigned to Sylvania Police Detective Laura Bliss. As part of her investigation, Detective Bliss contacted Investigator Amy Myers with the SMBO. Although there were no other complaints pending with the SMBO at that time, M.S. filed her complaint with the SMBO shortly thereafter, on April 15, 2015. Investigator Myers then contacted Detective Bliss and notified her of M.S.'s complaint against Heiney, and the two coordinated their respective investigations going forward.

{¶ 16} Detective Bliss and Investigator Myers jointly interviewed K.O. and recorded the conversation. K.O. told them that Heiney's fingers actually rubbed against her genitals when he examined her low back. At Bliss's suggestion, K.O. requested a copy of her medical records from Heiney's office.

{¶ 17} Detective Bliss conducted a videotaped interview of Heiney at the police station on May 6, 2015 regarding K.O.'s complaint. Heiney's records indicate that, within hours of his police interview, Heiney viewed and printed K.O.'s electronic medical record ("E.M.R."). The next day, Heiney asked one of his medical assistants, Jennifer Downard, to make an "add-on" to the E.M.R. by adding some of his handwritten

7.

notes. Heiney stated that he made the changes "to make sure [the E.M.R.] was as correct as it could be." He denied adding "blocks of information" but claimed that he just made minor additions to it.

{¶ 18} Investigator Myers also interviewed Heiney about K.O.'s allegations, which occurred on June 8, 2015.[1] Heiney was unaware that his interviews with Bliss and Myers regarding K.O. were recorded. Both interviews were played for the jury, and an overall summary of Heiney's recorded statements is set forth below:

{¶ 19} Heiney stated that he "always" wears gloves while performing examinations, unless he is examining for infection. He also claimed that he "always" asks permission before touching a patient's sensitive areas. Heiney stated that it is his practice to have a third person present when examining a patient. He is, however, occasionally unaccompanied if his medical staff is occupied with other patients. It is "highly unlikely" that he would see a new patient, like K.O., without having another individual in the room.

{¶ 20} Heiney stated that he does not perform "breast" exams but may examine a patient's chest if the patient is experiencing breast discharge or complaining of pain that radiates to, or from, the breast. If the latter, he would palpate the breast to try and reproduce the pain, and he would also compare one breast to the other. If Heiney palpated a breast, it should be noted in a medical record, although it might only state that

---

[1] Myers interviewed Heiney a second time, on July 6, 2015, following M.S.' complaint, but it was not recorded due to technical difficulties. Myers testified that the interview was shorter in duration and was limited to questions about his examination techniques. Myers did not ask Heiney about M.S.'s allegations.

8.

shoulder pain "radiates." He said that a breast discharge would definitely be noted. During such an exam, there is no need to touch a patient's nipple, unless the patient complains of "mastitis," which is inflammation of the mammary gland.

{¶ 21} When giving a shoulder injection, Heiney stated that his practice is to place gauze above the chest area to catch any fluids; he said that he would not place gauze in the cup of the bra or under the breast.

{¶ 22} Heiney could not specifically recall K.O., but in anticipation of his interview with Investigator Myers, Heiney reviewed her medical records. Based on that review, Heiney said that K.O. complained of low back pain and shoulder pain that was radiating to her upper arm, neck and chest.

{¶ 23} He said that if he did a chest exam on K.O., it was likely because she was complaining of pain in her pectoral muscles, which are above the chest. If she complained of low back and leg pain, it would be normal to ask her to bend over and touch her toes. He would also palpate the sacroiliac joint ("SI joint"), which is located in the middle of the buttock area, on either side of the tailbone. To palpate the SI joint, a patient could be seated or standing. The purpose of palpating is, in part, to try and reproduce the pain and also to feel for deformities of the spine.

{¶ 24} Heiney said that because K.O. was a new patient and because she had many areas of pain, it is likely that she would have changed into a gown before he examined her. Assuming that K.O. was in a gown, she would have had her underwear on. As part of his examination of her low back, he would likely have asked her to bend down and touch her toes, and because of the location of her pain (i.e. the S.I. joint), he would have

9.

pulled her underwear down just enough that the upper part of her buttocks would have been exposed. According to Heiney, the only reason to completely expose a patient's full buttock is if the patient complained of buttock, as opposed to low back, pain.

{¶ 25} Heiney denied that he has ever inappropriately touched a patient or been accused of doing so. Although he did not recall his examination of K.O., he denied performing an unnecessary breast exam on her because he would not deviate from appropriate conduct. Heiney characterized allegations of inappropriate conduct as "crazy." He added "I don't do anything that they don't say is okay."

{¶ 26} As part of the state's criminal investigation, Detective Bliss conducted a number of interviews, including Heiney's orthotist, Brian Kinsella and Heiney's two nurses. Bliss also interviewed office staff at Heiney's Sylvania office regarding record keeping practices, and she interviewed ten health care professionals to learn about standard exam procedures.

{¶ 27} Heiney's long-time orthotist, Brian Kinsella, also testified at trial. According to Kinsella, when Heiney examined a patient, Kinsella or one of Heiney's nurses, would "usually" be in the room. In the eight years that Kinsella worked with Heiney, Kinsella never saw Heiney place gauze underneath a female patient's breast. According to Kinsella, Heiney "always" wore gloves when performing an exam. As for low back exams, Kinsella testified that Heiney would ask a patient for permission to lower a patient's underwear, and he would only lower it "slightly," just enough to expose the SI joint. Kinsella never saw Heiney lower a female patient's pants to her knees.

10.

**Michigan Patients**

{¶ 28} The state offered the testimony of three female patients who treated with Heiney in his Michigan office—"C.G.," "L.G.," and "S.E."—under Evid. R. 404(B).

{¶ 29} C.G. saw Heiney for pain in her lower back and right leg, numbness in her leg, and stiffness in her neck. C.G. claimed that Heiney unnecessarily touched her breasts on April 14, 2015 in his office:

> [Heiney said,] ["]does it hurt here, show me where it hurts, does it hurt when you do this[?"] And then at one point during this process, he looked at me, grabbed the gown and the bra at the same time, pulled the strap down with his hand in this fashion, squeezed, put the * * * gown back up, walked around to the other side and repeated that exact same process * * *. [He said,] "now you don't have any pain here, no pain here[?] Okay.["] Bra and gown pulled to the side, reached and grabbed, and back up. * * * [He grabbed] "my whole breast tissue" in a "squeezing cupped fashion."

{¶ 30} S.E. sought treatment from Heiney for right shoulder pain. On April 21, 2015, Heiney entered the examination room to find S.E. still clothed. Heiney said that he was in a hurry and to "take off her top" so that she could receive an injection. Heiney offered to help S.E. take off her top, which she declined, and then watched her disrobe instead of leaving the room while she changed. Once she had a gown on, Heiney helped S.E. to remove her bra in preparation for an injection. S.E. testified that Heiney

examined both her breasts. As described by her, Heiney "poked" at her right breast and then "reached around and cupped" her left breast that included making "some type of movement" with her nipple. S.E. wondered "why is he doing this * * * first just poking it, there's no value to that, and then reaching around [to her] unaffected side."

{¶ 31} L.G. treated with Heiney a total of four times between late March and April of 2014. The first appointment was unremarkable. During her second appointment, L.G. complained of tightness in her low back. L.G. said that Heiney asked her to touch her toes while standing behind her, and without warning, he "pulled my pants and my underwear down to right above my knee and with his thumbs palpated the muscles above my hip parallel to my spine." After L.G. pulled up her pants and turned around, she observed that Heiney had an erection. The third appointment was unremarkable, but during the fourth and final appointment, Heiney again pulled her pants and underwear down. This time, L.G. pulled her underwear back up and said, "they [her underwear] didn't need to be down."

{¶ 32} C.G., S.E., and L.G. all filed separate complaints against Heiney with the local Michigan police department, and the allegations went to trial. Some charges resulted in convictions after a bench trial, and the charges relating to L.G. resulted in a directed verdict. Although the trial court allowed C.G., S.E., and L.G. to be cross-examined with their sworn testimony from the Michigan case, the court did not allow either side to introduce evidence regarding the ultimate dispositions of the Michigan charges.

12.

**Defense Witness**

{¶ 33} The defense called one witness, Dana LeFevers, who worked for Heiney as a medical assistant. LeFevers testified that either she, Kinsella, or another nurse were always in an examination room while Heiney was examining a patient and that he always wore gloves. LeFevers never witnessed Heiney do anything inappropriate with a patient. LeFevers testified that it was routine for Heiney to palpate a patient's pectoral muscles if that patient was complaining of shoulder or chest pain. She never saw him do any of the things he is accused of doing in this case, specifically: palpate a woman's breast tissue, cup a woman's breast, roll a woman's nipple with his fingers, place gauze underneath a woman's breast, or pull down a patient's underwear and pants.

**Jury Verdict and Sentence**

{¶ 34} The jury found Heiney guilty of two counts of Gross Sexual Imposition ("GSI"), in violation of R.C. 2907.05(A)(1) and (C), felonies of the fourth degree (Counts 1 and 2) and one count of Tampering with Records, in violation of R.C. 2913.42(A)(1) and (B)(1)(2)(a), a misdemeanor of the first degree (Count 3).

{¶ 35} The trial court sentenced Heiney to 180 days in the county jail and fined him $1,000 as to Count 3. With regard to Counts 1 and 2, the court sentenced Heiney to serve 90 days at the Department of Work Release and four years of community control. It also fined Heiney $2,000 as to Count 1 and an additional $2,000 as to Count 2 and ordered him to register as a Tier I sex offender pursuant to R.C. Chapter 2950. Heiney requested, and was granted, a stay of execution of his sentence, pending his appeal. Through his appellate counsel, he raises 11 assignments of error for our review.

13.

## Assignments of Error

Error I: The convictions for Gross Sexual Imposition are not supported by sufficient evidence. As such, Heiney's federal and state constitutional rights to due process of law have been violated and the trial court erred by not granting his Crim.R. 29(A) motion for judgment of acquittal.

Error II: The convictions for Gross Sexual Imposition are against the manifest weight of the evidence.

Error III: The trial court's decision to allow an audiotape to be played which contained no statements against interest or contradictory statements, but which included a non-testifying witness expressing his opinion that Heiney was a liar violated Heiney's right to a fair trial.

Error IV: The conviction for Tampering with Records is not supported by sufficient evidence and as such the trial court erred by not granting this Crim.R. 29(A) motion for judgment of acquittal.

Error V: The conviction for Tampering with Records is against the manifest weight of the evidence.

Error VI: The trial court erred when, after finding the state failed to comply with Crim.R. 16(K) failed to impose stringent enough sanctions and then allowed the state to violate the sanctions. The trial court also violated Heiney's right to cross-examine witnesses against him.

14.

Error VII: The trial court erred regarding the Evid.R. 404(B) evidence because it did not make the necessary findings for its admission, it was cumulative, and it was more prejudicial than probative. Further, the trial court erred by not giving curative instructions and wrongfully prohibited Heiney's right to cross-examination.

Error VIII: The trial court denied Heiney the right to a fair trial through a series of erroneous evidentiary rulings.

Error IX: The mandatory tier requirement imposed on Heiney is unconstitutional as cruel and unusual punishment.

Error X: The trial court denied Heiney a fair trial when it permitted a police detective to testify as an expert witness, to hearsay and by permitting her to vouch as to the truthfulness of the two complainants.

Error XI: The trial court's jury instructions, particularly as to the intent necessary to prove Gross Sexual Imposition and what constitutes force, were wrong in that they contradicted the clear statutory language and case law.

{¶ 36} We consider Heiney's eleven assignments of error out of order.

**1. Sufficiency of the Evidence: Tampering with Records**

{¶ 37} First, we consider Heiney's fourth assignment of error ("Error IV"), in which he claims that there was insufficient evidence to support his conviction for tampering with records pursuant to R.C. 2913.42(A)(1) and (B)(1)(2)(a), and that the trial court erred by denying Heiney's motion for acquittal under Crim.R. 29(A).

{¶ 38} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We examine the evidence in the light most favorable to the state and decide whether any rational trier of fact could have found that the state proved, beyond a reasonable doubt, all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997); *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78.

{¶ 39} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386. In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *See Jenks* at paragraph two of the syllabus; *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim).

{¶ 40} Heiney's tampering-with-records conviction was based on edits that he made to K.O.'s electronic medical record ("E.M.R.") An E.M.R. is generated after a doctor dictates patient notes into a recording device. The dictation is sent to an outside

16.

medical transcriptionist who types the record into a Microsoft Word document and sends the Word document to the medical office. At that point, one of Heiney's assistants would "copy and paste" the E.M.R. into the patient's chart. Occasionally, an E.M.R. would need to be amended, and such amendment is called an "add-on." Whenever an E.M.R. is modified or edited with an "add on," the original version still remains in the system but is stored on a different server. An audit log tracks when E.M.R.'s are modified, printed, or opened for viewing.

{¶ 41} The E.M.R. that K.O. requested and received from Heiney's office (which she later gave to the police) differed from the one that Heiney produced to the police in response to their subpoena. The latter version includes additional details and descriptions, which the state alleges were added by Heiney after his police interview "in an attempt to provide a medical rationale for his groping of [K.O.'s] breasts and buttocks." Both records were shown to the jury, and the relevant portions of each record are shown below. The original E.M.R. is on the left; the modified version is on the right:

| Original Progress Note Provided to K.O. | Modified Progress Note Produced Pursuant to Subpoena |
| --- | --- |
| **History:** * * *  <br>  [No reference] | **History:** * * * Sometimes radiates to chest. The low back, buttock & hip pain has been going on for years. |
| **Physical Exam**: * * * *Musculoskeletal*: * * *  <br>  [No reference] | **Physical Exam:** * * * *Musculoskeletal:* * * * No reproducible pain or discharge in chest * * * Tight hamstrings, pain to palpation at both SI joints. No spinal step-off bogginess. * * * |
| *Plan*: * * *  <br>  [No reference] | *Plan:* * * * We will work up back, buttock & hip pain further at that time with radiography. |

17.

{¶ 42} Heiney admits that K.O.'s E.M.R. was changed under his direction. Indeed, the audit log confirms that on May 6, 2015—within hours of his police interview—Heiney viewed and printed the E.M.R. Then, the next day, Heiney gave his assistant, Jennifer Downard, some handwritten notes on the printed E.M.R. and asked Downard to make an "add-on." Downard testified that this was how Heiney normally made "add-ons" to a patient's E.M.R., and that Heiney did not ask her to refrain from telling anyone about the changes. Heiney stated that he asked Downard to make the changes "to make sure [the E.M.R.] was as correct as it could be." Heiney produced the modified E.M.R. in response to subpoena; he did not produce a copy of the original E.M.R.

{¶ 43} R.C. 2913.42(A)(1), the "tampering with records" statute, provides, in part, that "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following: * * * Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record." Heiney argues that there was insufficient evidence to support his conviction for tampering with records because (1) he was privileged to alter his own medical records; (2) the "minor changes" did not contain any false information; and (3) there is no evidence that he acted with purpose to defraud.

{¶ 44} First, Heiney argues that because he owned the medical records, he was privileged to make changes to them. Heiney is incorrect. The statute precludes tampering with both private and public records. *See* R.C. 2913.42(B)(4); *see also* 1974 Committee Comment to R.C. 2913.42 (noting that the statute "prohibits tampering with

18.

all private as well as public records, for fraudulent purposes, and thus expands upon former law which prohibited such conduct only with respect with public documents.").

{¶ 45} Heiney also argues that he could not be convicted of violating R.C. 2913.42(A)(1) because "the tampering must involve fraudulent information." Heiney is, again, incorrect. The statute prohibits more than just the falsification of records. It also criminalizes destroying, removing, concealing, altering, defacing, or mutilating records. The evidence sufficiently established that Heiney altered the E.M.R.

{¶ 46} Finally, Heiney argues that the "minor additions * * * accurately listed the same symptoms to which [K.O.] testified about," and points to K.O.'s statement to police in which she states that her symptoms included some pain in the buttocks. In essence, Heiney argues that there was no evidence that he altered the E.M.R. "with purpose to defraud." The state responds that Heiney altered K.O.'s E.M.R. to provide a "medical rationale for his groping of [K.O.'s] breasts and buttocks."

{¶ 47} R.C. 2913.01(B) defines "defraud" as "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." Pursuant to R.C. 2901.22(A), purpose requires "an intention to cause a certain result or to engage in conduct that will cause that result." Purpose or intent can be established by circumstantial evidence from the surrounding facts and circumstances in the case. *See Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492.

{¶ 48} In a similar case, a physician was under investigation for committing Medicaid fraud. *State v. Urban,* 10th Dist. Franklin No. 01AP-239, 2002 Ohio App. LEXIS 1421 (Mar. 28, 2002). After receiving subpoenas of his medical files, he inserted

19.

additional details into progress notes. The doctor was then indicted for fraud and tampering with evidence, in violation R.C. 2921.12(A).[2] On appeal, the Tenth Appellate District found that there was legally sufficient evidence to convict him of tampering. The court held,

> A forensic expert testified that the charts had been altered in Dr. Urban's handwriting. Indeed, Dr. Urban does not deny that he added new material to patient charts after they were subpoenaed. Rather, he stated that he did not know it was wrong and that his actions did not actually hamper the investigation.

> We acknowledge that there was trial testimony that Dr. Urban wrote openly in the charts, in plain view of anyone who would walk by, and that, when asked about it, he explained that his lawyer told him he was allowed to do it. However, the fact that exculpatory evidence was presented does not mean that the jury was required to believe it. The jury could rely on the following evidence of tampering, including the sequence of events. * * * Then there was evidence that patient charts were subpoenaed, after which Dr. Urban personally reviewed the files and altered most of them. Charts

---

[2] The "Tampering with evidence" statute, set forth in R.C. 2921.12(A)(1), provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * (1) Alter * * * any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

showed additions of a type that could be viewed as an attempt to justify testing and billing. The jury could reasonably find that Dr. Urban altered the documents by adding to them. The jury could reasonably infer a motive to deceive and could find defendant guilty beyond a reasonable doubt of tampering with the evidence.

{¶ 49} The evidence is strikingly similar in the case before us. Given that Heiney altered the E.M.R. shortly after his police interview, we find that the jury could reasonably conclude that Heiney's purpose in doing so was to defraud—i.e., to deceitfully legitimize an otherwise unnecessary and improper touching of a patient's erogenous zone.

{¶ 50} Heiney's fourth assignment of error is not well-taken.

### 2. Manifest Weight of the Evidence: Tampering with Records

{¶ 51} In Heiney's fifth assignment of error ("Error V"), he argues that the tampering conviction was against the manifest weight of the evidence.

{¶ 52} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, quoting *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the

21.

credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 53} A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175. Moreover, "'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416 (Feb. 6, 1997).

{¶ 54} Under this assignment of error, Heiney merely repeats his arguments relating to the sufficiency of the evidence. Importantly, Heiney does not take issue with any findings by the jury, except as to the ultimate issue—i.e., whether he acted with an intent to defraud. Heiney claims that he did not; the jury found that he did. "A conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony." *State v. Dean*, 6th Dist. Lucas No. L-16-1301, 2018-Ohio-1740, ¶ 44, quoting *State v. Houston*, 10th Dist. Franklin No. 04AP-875, 2005-Ohio-4249, ¶ 38(reversed and remanded in part on other grounds). We find that Heiney's tampering conviction is not against the manifest weight of the evidence, and his fifth assignment of error is not well-taken.

22.

### 3. The Admissibility of "Other Acts" Evidence under Evid. R. 404(B)

{¶ 55} In Heiney's seventh assignment of error ("Error VII"), he claims that the trial court erred by admitting the testimony of C.G., S.E., and L.G. These three women each claimed that Heiney had inappropriate contact with them in his Michigan office. The state argued that their testimony was admissible because it was sufficiently similar to the testimony of M.S. and K.O. and therefore probative of Heiney's "intent," "preparation," "plan," and "absence of mistake or accident" under Evid. R. 404(B).

{¶ 56} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). The rule also requires that the proponent of "other acts" evidence "shall provide reasonable notice in advance of trial * * * of the general nature of any such evidence it intends to introduce at trial." Evid.R. 404(B). When considering whether to allow Evid.R. 404(B) evidence, a trial court should consider (1) whether the evidence is relevant, (2) whether the evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B) and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. The trial court has broad discretion to determine the admissibility of evidence under Evid.R. 404(B). *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 22.

23.

**{¶ 57}** Heiney makes the following arguments regarding C.G., S.E., and L.G.: (1) the court erred by admitting the testimony of all three witnesses under Evid.R. 404(B) and *Williams*; (2) the court failed to give a limiting instruction regarding their testimony; and (3) the trial court erred by allowing the witnesses to testify without being voir dired.

**{¶ 58}** Regarding C.G., Heiney's trial counsel stipulated to the admission of her testimony under Evid.R. 404(B). Thus, Heiney has expressly waived any argument that C.G.'s testimony should have been excluded under Evid. R. 404(B). *State v. Smith*, 1st Dist. Hamilton Nos. C-160836, C-160837, 2017-Ohio-8558, ¶ 36.

**{¶ 59}** Regarding S.E., Heiney's counsel also stipulated to the admissibility of her testimony under Evid.R. 404(B) but with one exception: he argued that S.E.'s testimony should be limited to exclude any reference that Heiney touched her nipple. Heiney claimed that because neither K.O. nor M.S. alleged that Heiney had touched her nipple, specifically, S.E.'s testimony in this regard was "distinctly dissimilar;" the probative value of such testimony was low; and the danger of unfair prejudice was high. *Williams* at ¶ 20. We disagree. While not identical in all respects, we find that S.E.'s testimony was sufficiently similar to the charged acts relating to K.O and M.S., and the alleged acts had "such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question." *State v. Burson*, 38 Ohio St. 2d 157, 149, 311 N.E.2d 526 (1979). We find that S.E.'s testimony was relevant, probative of "intent" and "absence of mistake or accident" under Evid.R. 404(B), and not unduly prejudicial. The

24.

trial court did not abuse its discretion by refusing to limit S.E.'s testimony as Heiney had requested.

{¶ 60} Regarding L.G., Heiney made two objections in the trial court relating to the admissibility of her testimony under Evid.R. 404(B): (1) L.G. should not be permitted to testify because the Michigan court dismissed the charges that related to her allegations, and (2) L.G.'s testimony that Heiney had an erection exceeded the scope of the state's pretrial notice. On appeal, Heiney repeats these arguments and adds that the trial court improperly prohibited him from cross-examining L.G. regarding the Michigan directed verdict, and L.G.'s testimony regarding Heiney's erection conflicted with her Michigan testimony. We will address Heiney's arguments relating to the directed verdict first.

{¶ 61} L.G. alleged that, on two separate appointments, Heiney abruptly pulled down her pants and underwear while she was bending over and touching her toes. She noticed that he had an erection after the first incident. Given that L.G. did not allege that Heiney actually touched any of her erogenous zones, Heiney was charged with indecent exposure. The Michigan court issued a directed verdict for Heiney because the alleged indecent exposure occurred in a doctor's office rather than in public, as required for that crime. Before trial, Heiney moved to prohibit L.G. from testifying as an Evid.R. 404(B) witness because L.G.'s charges had been dismissed. The court denied the motion. Heiney then asked for permission to raise the directed verdict during L.G.'s cross-examination. His request was denied. Heiney claims this these rulings were error and L.G.'s testimony was unduly prejudicial because "the jury was told that it had gone to

25.

trial in Michigan" and was therefore led "to conclude incorrectly that he had been convicted."

{¶ 62} We find that the trial court did not abuse its discretion by allowing L.G. to testify under Evid.R. 404(B) despite the directed verdict in Michigan. Evid.R. 404(B) expressly allows evidence of other "crimes, wrongs, *or acts*" as long as the evidence is introduced for a permissible purpose. Given the temporal proximity (i.e., one year) and similarity between L.G.'s and K.O.'s allegations (i.e., both women allege that Heiney abruptly pulled their pants and underwear down while he was standing behind them and examining their backs), L.G.'s testimony regarding Heiney's other "*act*" was relevant and probative of "intent" and "absence of mistake or accident" under Evid.R. 404(B).

{¶ 63} Moreover, the directed verdict, itself, was irrelevant and inadmissible. "Generally, a judgment of acquittal is not admissible for two reasons: (1) because it is hearsay * * * and (2) because it is not relevant since it is not a finding of fact, but merely an acknowledgement that the government failed to prove an essential element of the offense beyond a reasonable doubt." (Citations omitted.) *State v. Perry,* 10th Dist. Franklin No. 01AP-996, 2004-Ohio-5152, ¶ 65. Thus, the trial court did not abuse its discretion by prohibiting Heiney from raising the directed verdict through L.G.'s cross-examination.

{¶ 64} In addition, we note that Heiney, not the state, referred to the Michigan criminal trial before the jury. During L.G.'s direct, the prosecutor only asked whether she had reported the incident to police. On cross, Heiney referred to L.G.'s testimony "in Monroe County in front of Judge Bronson" in which "the prosecutor in Monroe County"

26.

asked her "a lot of questions." While it was Heiney's right to impeach L.G. with her sworn testimony in the Michigan case, any corresponding prejudice that may have resulted from referencing the Michigan criminal trial was caused by Heiney's own line of questioning.

{¶ 65} Heiney also argues that the trial court erred by refusing to strike L.G.'s testimony that he had an erection during the first exam. Heiney claimed that this testimony was a "total surprise" because the state's written notice of L.G.'s testimony under Evid.R. 404(B) did not reference an erection, and L.G. did not mention an erection while testifying in the Michigan case. The trial court refused to strike the testimony because Heiney's counsel acknowledged receiving the sheriff's report from Monroe County in discovery, and that report documented Heiney's "erect penis" during L.G.'s exam.

{¶ 66} We find the trial court's ruling was not an abuse of discretion. Evid.R. 404(B)'s notice requirement "should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith." (Staff Notes to the 2012 Amendment to Evid.R. 404). Here, Heiney had actual notice of the erection allegation through other discovery and, moreover, there is no evidence of bad faith. In addition, Heiney fully cross-examined L.G. regarding the alleged "inconsistency" with her Michigan testimony, where she did not mention an erection.

{¶ 67} In sum, we reject Heiney's arguments that the court erred by admitting the testimony of C.G., S.E., and L.G. under Evid.R. 404(B). Within this same assignment of

27.

error, Heiney also argues that the court erred by failing to give a proper limiting instruction and by failing to voir dire the 404(B) witnesses.

{¶ 68} Prior to jury deliberations, the court offered the following instruction.

Now, evidence was received about the commission of acts other than the offenses with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the defendant in order to show that he acted in conformity accordance with that character. If you find that the evidence of other crimes, acts is true and that the defendant committed it, you may consider that evidence only for the purpose of deciding whether it proves the absence of mistake or accident or the defendant's motive, opportunity, intent or purpose, preparation or plan to commit the offense charged in this trial or knowledge of circumstances surrounding the offense charged in this trial. That evidence cannot be considered for any other purpose.

{¶ 69} We find that this instruction properly lessened any prejudicial effect of the 404(B) witnesses, and we may presume that the jury followed the court's instructions. *Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 23, citing *State v. Garner,* 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995); *Pang v. Minch,* 53 Ohio St.3d 186, 195, 559 N.E.2d 1313 (1990).

{¶ 70} Finally, Heiney argues that the trial court "specifically held that no 404(B) witness could testify without being subject to voir dire. That did not occur." Heiney 28.

failed to develop his argument, and we found no such order by the trial court. We presume that Heiney may be referring to the court's instruction that "any 'bad acts' cannot be referred [to] in voir dire and/or opening statements." Heiney does not allege noncompliance with that order, nor did this court find any.

{¶ 71} For all these reasons, we find Heiney's seventh assignment of error not well-taken.

### 4. The Testimony of Dr. Christopher Foetisch, M.D.

{¶ 72} Heiney's sixth assignment of error ("Error VI") relates to the testimony of Dr. Christopher Foetisch, who treated M.S. for shoulder pain after she left Heiney's practice. Foetisch testified as both a lay witness (as M.S.'s treating physician) and as an expert (in orthopedic medicine generally). Heiney argues that Foetisch's expert testimony violated Crim.R. 16(K), and the trial court improperly limited his cross-examination of Foetisch.

### Crim. R. 16(K)

{¶ 73} Crim.R. 16(K) states:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to

trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 74} Approximately three months before trial, the state produced Foetisch's curriculum vitae and his records of treatment for M.S. Then, two months before trial, the prosecutor wrote a letter in which she provided a summary of Foetisch's "expected testimony, conclusions and opinions" and stated that the letter was provided "[p]ursuant to Criminal Rule 16(K)." Although Heiney argues that the "record is silent as to how the prosecutor spontaneously arrived at the expert conclusions she placed in [the letter]," the record makes clear that the prosecutor drafted the letter after interviewing Foetisch.

{¶ 75} At a pretrial on January 22, 2016, Heiney argued that the prosecutor's letter did not comply with Crim.R. 16(K) because it was not prepared by Foetisch himself, and the defense "need[ed]" a report from *him*. The trial court found that the letter "conformed" to Crim.R. 16(K) because it summarized Foetisch's expert opinions and adequately prevented any unfair surprise at trial, and stated that "Dr. Foetisch will not be permitted to testify beyond the parameters of those set forth in [the letter.]" Then, at trial, Foetisch was designated as an expert witness without objection from defense counsel.

{¶ 76} On appeal, Heiney makes a general argument that the trial court "allowed the state to violate Crim. Rule 16(K) without sufficient sanction," and argues that Foetisch was improperly permitted to testify beyond the scope of the letter.

{¶ 77} Recently, in *State v. Walls,* 6th Dist. Erie Nos. E-16-027, E-16-028, 2018-Ohio-329, ¶ 31, we held that "Crim.R. 16(K) mandates exclusion of expert testimony

30.

where a written report has not been disclosed in accordance with the rule." And we agree with Heiney that Crim.R. 16(K) requires a report prepared *by the expert*—not the prosecutor or anyone else—so that opposing counsel can cross-examine the expert with his or her own words. In this case, however, Heiney expressly waived any argument that Foetisch should have been precluded from testifying as an expert under Crim.R. 16(K): when the state moved for Foetisch to be designated as an expert in orthopedic medicine, Heiney's counsel responded "no objection." *See State v. Williams*, 6th Dist. Lucas No. L-14-1067, 2015-Ohio-1686, ¶ 17-21 (appellant waived the Crim.R. 16(K) violation by objecting only to the admission of the expert's report and not to the expert's testimony.)

{¶ 78} Next, we consider whether the trial court improperly allowed Foetisch to testify beyond the scope of the letter. It is within the trial court's discretion to determine whether any portion of an expert's proposed testimony exceeds the scope of what was disclosed in the report. *Walls* at ¶ 33. Heiney argues that Foetisch exceeded the scope of the letter because (1) he testified to American Medical Association ("AMA") guidelines; (2) he stated that he has never found a medically-necessary reason to perform a breast exam; and (3) he testified regarding M.S.'s complaint to the medical board.

{¶ 79} At trial, Foetisch testified that he follows "generally recommended" guidelines set forth by the AMA by, for example, always having a third person in the room when he examines a patient. The letter, however, makes no reference to AMA guidelines. When Heiney objected at trial, the state argued that Foetisch was testifying as a lay witness by "describing merely his practice and his knowledge of the [AMA] Guidelines for having chaperones in the room, specifically when the exam of a patient is

31.

of a sensitive area." The trial court found that "[s]o long as [the state] is not inquiring with the specific question of an expert, and * * * what is required * * * [Foetisch] certainly is allowed to testify [in his capacity as a lay witness]." We agree that such lay testimony is permissible. *State v. Lewis,* 192 Ohio App.3d 153, 2011-Ohio-187, 948 N.E.2d 487, ¶ 23 (5th Dist.). We find that Foetisch's testimony relating to the AMA guidelines was confined to his own experience and training, and he was not asked to render an expert opinion beyond his own practice.

{¶ 80} Second, Heiney complains that Foetisch should not have been allowed to testify that he, as a practicing orthopedic surgeon, has never found it medically necessary to give a patient a breast exam. This testimony was not beyond the scope of the Crim.R. 16(K) letter, which expressly states that Foetisch "has never found it medically necessary to give a patient of his a breast exam * * * [and that he] does not consider it a typical course of practice for an orthopedic doctor to perform breast exams."

{¶ 81} Finally, Heiney claims that Foetisch was somehow allowed to provide expert testimony "regarding the complaint [M.S.] filed with the medical board." We disagree. The objection that Heiney relies upon concerned Foetisch's testimony regarding his own "patient scheduling worksheet" which contains a notation that M.S. "called inquiring about procedure for [shoulder] exams as treated with another ortho with each visit becoming increasingly invasive and inappropriate. Pt was quite tearful." This was not expert testimony and, in fact, it did not even reference M.S.'s medical board complaint.

32.

**{¶ 82}** In sum, Foetisch did not offer any expert opinions beyond the scope of the letter.

### B.  Heiney's Cross-Examination of Foetisch

**{¶ 83}** Heiney also claims that the trial court improperly limited his right to cross-examine Foetisch.  A trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth [and] (2) avoid needless consumption of time."  Evid.R. 611(A)(1) and (2).  The trial court has broad discretion to limit cross-examination. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

**{¶ 84}** First, Heiney complains that the trial court "would not allow defense counsel to cross-examine Foetisch with the [state's] summary."  We disagree.  As Heiney's counsel began to cross-examine Foetisch regarding the letter, the state objected, and Heiney's counsel told the judge that he merely intended to "ask him if he participated in the drafting and preparation of that letter."  Heiney's counsel was then allowed to use the letter to cross-examine Foetisch exactly as he intended.

**{¶ 85}** Heiney also complains that he was precluded from fully cross-examining Foetisch with regard to his "bias and possible motivations."  During his cross-examination, Foetisch admitted that he could be considered to be in "competition" with Heiney, that he is not friends with Heiney, and that Heiney has published more scholarly articles than he.  The state then objected to extended questioning regarding the relevant qualifications and accomplishments of Foetish and Heiney, arguing that "the defense is

33.

attempting to beef up the credibility of the defendant without having the defendant testify." The trial court agreed, but allowed Heiney to proffer such evidence into the record.

{¶ 86} We fail to understand how the proffered evidence, which exhaustively details all of the relative professional accomplishments of Heiney and Foetisch (e.g., Heiney teaches courses in orthopedic surgery but Foetisch does not; Heiney has published twenty-four articles on orthopedic surgery while Foetsch has published only four; etc.) is probative of "bias" or "motive." Regardless, Heiney's right to cross-examine is not unlimited. We find that Heiney's counsel adequately established a potential for bias—i.e., Heiney and Foetish were "competitors" and not friends—and the jury had sufficient information to make a discriminating appraisal of Foetisch's motives and bias.

{¶ 87} Heiney also argues that the trial court improperly precluded him from using medical journals and scholarly articles for the purpose of demonstrating that Heiney's examination techniques, while perhaps different from those employed by Foetisch, were "in accordance with authoritative text books." We disagree. The trial court allowed Heiney to publish to the jury and to question Foetisch with 17 such exhibits (exhibits C through S), but curtailed their use after that. The court did not err in preventing further repetitive testimony and limiting an already lengthy cross-examination. *See Treesh* at 480, (a trial court may limit cross-examination to avoid repetitive testimony).

{¶ 88} For all of these reasons, Heiney's sixth assignment of error is not well-taken.

34.

## 5. Sufficiency of the Evidence: Gross Sexual Imposition

{¶ 89} Next, we consider whether the trial court erred by denying Heiney's motion for acquittal under Crim.R. 29(A) with respect to his convictions for gross sexual imposition under R.C. 2907.05(A)(1) (first assignment of error, "Error I").

{¶ 90} Heiney was convicted of two counts of gross sexual imposition under R.C. 2907.05(A)(1), which provides that "[n]o person shall have *sexual contact* with another * * * when * * * [t]he offender purposely compels the other person * * * to submit by *force or threat of force*." (emphasis added). Heiney argues that there was insufficient evidence of "sexual contact" and "force or threat of force."

### A. "Sexual Contact"

{¶ 91} Heiney claims that there was insufficient evidence of "sexual contact" because there was no evidence that he touched M.S. or K.O. for purposes of sexual gratification.

{¶ 92} "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The state was not required to show that Heiney was actually sexually aroused or gratified, but that he touched M.S. and K.O. for that purpose. *State v. Brown*, 3d Dist. Hardin No. 6-12-01, 2012-Ohio-3904, ¶ 21. In the absence of direct testimony regarding sexual arousal or gratification, "the trier of fact may infer a purpose of sexual arousal or gratification from the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts, the trier of facts may infer

35.

what the defendant's motivation was in making the physical contact with the victim." (Citations omitted.) *State v. S.H.W.,* 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, ¶ 62.

{¶ 93} Heiney argues that such evidence is completely lacking. In support, Heiney argues that all of the touching occurred during medical examinations in which Heiney maintained a "professional demeanor," and that Heiney did not ask M.S. or K.O. to "keep quiet" about anything. Heiney also argues that neither witness observed Heiney display any obvious type of sexual arousal, such as an erection.

{¶ 94} While Heiney's arguments highlight evidence that he touched M.S. and K.O. for legitimate medical purposes, his arguments do not negate the presence of countervailing evidence in the record that, if believed by the jury, established that Heiney touched M.S. and K.O. for his own sexual gratification. For example, Foetisch testified that, as an orthopedic surgeon, he has never found it medically necessary to give a patient a breast exam, place gauze in the bra of a patient who is receiving a shoulder injection, or remove a patient's underwear during an examination. And, as discussed, three separate witnesses—C.G., S.E., and L.G.—offered testimony regarding similar acts by Heiney and their testimony was properly admissible under Evid.R. 404(B) because it was probative of Heiney's actual "intent" when he touched M.S. and K.O. in similar ways—i.e., that his "intent" was for purposes of sexual gratification. *See, e.g., State v. Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, ¶ 62 (finding "other act" testimony was relevant in action against physician for gross sexual imposition because it tended to disprove that the

36.

breast exams were for legitimate medical purposes and, instead, were performed for sexual arousal or gratification.).

{¶ 95} Moreover, evidence that Heiney acted with a nefarious purpose may be inferred from Heiney himself. During his interviews, Heiney asserted that he always wears gloves and asks permission before touching a patient's sensitive areas, there is no reason to perform a chest exam unless a patient complains of pain radiating to or from the chest area, and there is no reason to expose a patient's full buttocks if the patient's complaints are limited to the low back or SI joint. And yet, according to M.S., Heiney pushed and squeezed her entire breast with his bare hand, and did not ask permission before pulling her bra cup away and placing gauze under her exposed breast. And, according to K.O., Heiney did not ask for permission before removing her pants and underwear; Heiney fully exposing her buttocks and vagina; Heiney touched her vagina with bare hands and without any explanation or warning; and Heiney touched her full breast, without gloves, despite the absence of any complaint by her of pain or inflammation there.

{¶ 96} We find, examining the evidence in the light most favorable to the state, that there was sufficient evidence that Heiney's contact with M.S.'s and K.O.'s erogenous areas was for the purpose of sexual arousal or gratification.

### B. "Force or Threat of Force"

{¶ 97} Heiney also argues insufficient evidence of "force or threat of force." "Force" is expressly defined by the Revised Code as "any violence, compulsion, or

37.

constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 98} "Any," as used in R.C. 2901.01(A)(1), is an adjective. "'As an adjective, 'any' is defined as: '[o]ne or some, regardless of kind, quantity, or number; an indeterminate number or amount.'" *State v. Euton*, 3d Dist. Auglaize No. 2-06-35, 2007-Ohio-6704, ¶ 60, quoting The American Heritage Dictionary (2nd College Ed.1985) 117. "[T]he insertion of the word 'any' into the definition of 'force,' recognizes that different degrees and manners of force are used in various crimes with various victims." *State v. Lillard*, 8th Dist. Cuyahoga No. 69242, 1996 Ohio App. LEXIS 2150, *15 (May 23, 1996).

{¶ 99} "Violence" is defined, in part, as "[t]he use of physical force" or "[p]hysical force exerted for the purpose of violating, damaging, or abusing." *State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 19, quoting *Black's Law Dictionary* 1801 (14th Ed.2014) and *The American Heritage Dictionary* at 1350.

{¶ 100} "Compulsion" means "[t]he act of compelling; the quality, state, or condition of being compelled." *Stevens* at ¶ 19, quoting *Black's* at 348. "Compulsion can take other forms than physical force; but in whatever form it appears* * * [i]t can best be considered under the heads of obedience to orders, material coercion, duress per minas, and necessity." *Id.,* quoting Turner, *Kenny's Outlines of Criminal Law* 54 (16th Ed.1952).

38.

{¶ 101} "Constraint" means "state of being checked, restricted, or compelled to avoid or perform some action." *Merriam Webster's Collegiate Dictionary* 248 (10th Ed.1996).

{¶ 102} Importantly, the plain language of R.C. 2907.05(A)(1)requires a causal connection between the defendant's use of "force or threat of force" and the victim's "submission" to the sexual contact. "Submit" means "a. to yield oneself to the authority or will of another: SURRENDER; b. to permit oneself to be subjected to something." *Merriam Webster's Collegiate Dictionary* 1173 (10th Ed.1996). Accordingly, the essential issue is whether the perpetrator's exertion of *any* amount of "force or threat of force" was sufficient to overcome the will of the victim. *State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 49, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988) (stating that R.C. 2907.05(A)(1) requires more than "force necessary to facilitate the act"—i.e., the sexual contact itself—and, instead requires "force or threat of force sufficient to overcome the will of the victim.").

{¶ 103} Heiney argues that R.C. 2907.05 does not criminalize sexual contact based on any special position of trust, such as the doctor-patient relationship, and there was no evidence that he "ever tried to force or restrain [M.S. or K.O.] in any way or even verbalized a threat." In response, the state argues that Heiney is in "a position of authority" as a medical professional and, accordingly, the force may be "subtle and psychological" under the Supreme Court of Ohio's decision *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). Heiney claims, however, that *Eskridge* has been limited to cases of parent-child sexual abuse. Finally, the state also argues that, even if

39.

*Eskridge* is inapplicable, Heiney's physical manipulation of the victims' clothing was sufficient physical "force."

{¶ 104} In *Eskridge*, a father was accused of raping his four-year-old daughter. When considering the force element of rape, the court recognized that coercion is inherent in the parent-child relationship and stated that "force need not be overt and physically brutal, but can be subtle and psychological." *Id.* at 58-59.

{¶ 105} Four years later, however, the Supreme Court of Ohio issued *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), in which the court considered whether the defendant could be convicted for the forcible rape of his adult daughter, where the *only* alleged "force" was psychological compulsion. The court found that psychological compulsion was insufficient "force," and clarified that *Eskridge* was "based solely on the recognition of the amount of control that parents have over their children, particularly young children." *Id.* at 55. Then, without any analysis of the statutory components of "force" under R.C. 2901.01(A)(1), the court held that "[a] defendant purposefully compels another to submit to sexual conduct by force or threat of force if the defendant uses *physical* force against that person, or creates the belief that *physical* force will be used if the victim does not submit." *Id.* at paragraph one of syllabus (emphasis added).

{¶ 106} A few years after *Schaim*, the Supreme Court of Ohio revisited the issue of "force" in *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998). In *Dye*, the defendant, a 44-year-old non-relative, cared for a 9-year-old boy on a weekly basis in his home. The issue was whether the defendant could be convicted of raping that child "without evidence of express threat of harm or evidence of significant physical restraint."

The defendant argued that *Eskridge* was inapplicable due to the absence of a parent-child relationship, but the court disagreed, stating that *Eskridge* was applicable in cases involving children and "an important figure of authority." *Id.* at 767, quoting *Eskridge* at 59. The court noted that although defendant was not the victim's parent, he "stood in a position of authority over him" and "the evidence of psychological force is substantial." *Id.* The court also "recognize[d] that it is nearly impossible to imagine the rape of a child without force involved." *Id.* at 766.

{¶ 107} Our review of Ohio case law indicates that, following the subsequent decisions of *Schaim* and *Dye*, the recognition of the legal sufficiency of mere "subtle and psychological" force under *Eskridge*—which is, by its very nature, neither *physical* force nor threat of *physical* force, as required under *Schaim*—has been limited to cases of rape or gross sexual imposition involving a defendant with some type of parental or similar authority over a child, or situations involving closely-analogous relationships of disparate power between the defendant and victim. *See, e.g.*, *State v. Fortson*, 8th Dist. Cuyahoga Delaware No. 92337, 2010-Ohio-2337, ¶ 86 (extending "the *Eskridge* rule" regarding "subtle and psychological" force to abuse by a correctional officer against female inmates); *State v. Oddi*, 5th Dist. No. 02CAA01005, 2002-Ohio-5926, ¶ 57 (extending *Eskridge* to sustain GSI conviction against drivers education instructor who, "[a]lthough not a parent, or in loco parentis, appellant was certainly in a position of authority" over "a child of fifteen-and-a-half.").

{¶ 108} But, separate and apart from the Supreme Court of Ohio's recognition of the sufficiency of mere "subtle and psychological" force in *Eskridge*, the court also stated

in that same opinion that "[a]s long as it can be shown that the * * * victim's will was overcome by fear or duress, the forcible element of rape can be established." *Eskridge*, 38 Ohio St.3d at 58, 526 N.E.2d 304. "[T]he Court's statement regarding overcoming the victim's will was not specified to apply only to position of authority over children cases. It was set forth as general law." *State v. Rupp,* 7th Dist. Mahoning No. 05MA166, 2007-Ohio-1561, ¶ 28; *Accord, State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 40. Indeed, whether "the victim's will was overcome by fear or duress" was the key inquiry in three analogous cases involving allegations of sexual misconduct by medical providers: *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, ¶ 12; *State v. Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, ¶ 109; and *State v. Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, ¶ 36.

{¶ 109} In *Pordash*, the Ninth District reviewed the case of a chiropractor convicted on three counts of forcible rape against three different women. In each instance, the defendant-chiropractor inserted his finger into the female patient's vagina during a treatment session and while the patient was laying on the examination table. The court stated that although "the doctor-patient relationship does not create an inference of force, that is not to say that it is entirely irrelevant. The relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Pordash* at ¶ 12, citing *Eskridge* at 58. "As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.*, quoting *Eskridge* at 59. The *Pordash* court found sufficient evidence of force because each victim testified that they experienced "intense fear" during these encounters because

42.

"each victim knew of Appellant's extensive background in martial arts" and "feared that any resistance would lead to serious bodily harm." *Id.* at ¶ 12.

{¶ 110} In *Dew*, the Seventh District considered a defendant-chiropractor who was convicted, among other things, of GSI against "Patient B" and forcible rape against "Patient C." The court found insufficient evidence as to both.

{¶ 111} "Patient B" testified that during a chiropractic treatment session, the defendant pulled down her underwear to massage her bare buttocks, while commenting that she must have worn matching undergarments for his benefit. During a subsequent visit, the defendant strapped Patient B to the examination table by her ankles. Then, while she was face-down, he massaged her and "ran his fingertips along the sides of her bare breasts in a tickling motion. She said she was scared and froze, afraid to move." *Id.* at ¶ 38. The court found that this was insufficient evidence of force because "Patient B never stated she believed Dew would cause her contemporaneous harm if she resisted his touching." *Id.* at ¶ 117. The court found that, unlike the *Pordash* victims, Patient B's subjective fear was not enough because there was no evidence of an implicit "threat of force." That is, "[t]here was no evidence of an attempt to frighten Patient B or to imply that resistance would lead to force." *Id.* at ¶ 119.

{¶ 112} We find that the Seventh District's analysis, however, improperly equates "force" with "violence" *alone*—even though "force" also includes "any" amount of physically-exerted "compulsion" or "constraint." R.C. 2901.01(A)(1). This seems to have caused the court to ignore evidence of physical "constraint"—i.e., Patient B was physically strapped to the examination table—although it noted elsewhere in its opinion

43.

that the strap was "only around her ankles and it would have been easy to slip it on or off." *Id.* at ¶ 40. But, R.C. 2901.01(A)(1) says "*any* violence, compulsion, or constraint physically exerted by any means" is sufficient to establish force—thus even a minimal "constraint" is sufficient.

{¶ 113} The other patient in *Dew*, "Patient C," alleged that Dew had raped her during a chiropractic exam. Patient C testified that the defendant performed several "internal coccyx adjustments," performed digitally through the rectum, to relieve her tailbone pain. During three of these adjustments, the defendant inserted his finger in her vagina while she was lying face-down on the examination table. *Id.* at ¶ 31-34. The patient testified that she consented to the vaginal "adjustments" because she trusted him as a doctor. *Id.*

{¶ 114} The *Dew* court noted that "the state did not advance much of an argument about force with regard to the rape of Patient C, other than asserting that the 'force' stems from the fact that Dew exceeded the scope of proper treatment" and it concluded that even though the doctor "may have used fraud or deception to secure Patient C's consent * * * this does not satisfy the force element of rape." *Id.* at ¶ 123. The court found insufficient evidence of force because Patient C "never said she feared Dew, was intimidated by him, or that she believed resistance would lead Dew to cause her harm." *Id.* at ¶ 123. But, as with Patient B, the Seventh District's analysis improperly focused on the "violence" aspect of force while ignoring that force also includes *any* amount of coercion or constraint physically exerted by any means, R.C. 2901.01(A)(1); 2907.05(A)(1), of which there may have been evidence in the record.

{¶ 115} Finally, in *Roy*, the Ninth District addressed alleged improper sexual contact by a defendant physician against three adult women:  Annette, Jocelyn, and Jolene.

{¶ 116} Annette and Jocelyn were both potential employees in Roy's medical office.  On Annette's first day on the job as a medical assistant in Roy's office, he told her that she would need a physical exam to work there.  During the exam, he pulled down her bra and fondled her breasts. *Id.* at ¶ 10-13.  Annette testified that he later put an arm around her, and she tried to step away to some degree and that Roy then blocked the doorway. *Id.*

{¶ 117} Jocelyn testified that she came to the defendant's medical office for an after-hours job interview.  No one else was present.  Roy told her that he would need to give her a physical exam as part of the application.  She testified that Roy was standing in front of her as he took her blood pressure, and she could feel that he had an erection "rubbing on her knee."  She testified that she did not leave or ask Roy to stop because she was afraid.  Later in the medical exam, he unsnapped her bra and groped her breasts while she was laying on the exam table and he was positioned between her and the door.  He later asked her to pull her pants down to her knees, which she did, and he rubbed the inside of her legs with his hands. *Id.* at ¶ 16-23.

{¶ 118} The court found sufficient evidence to support the GSI convictions with regard to Annette and Jocelyn because both women were isolated in the closed examination room, where Roy was positioned between them and the door.  The court noted that "the relationship of the parties is a relevant fact when examining whether the

45.

element of force has been proven." *Id.* at ¶ 35 quoting *Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, at ¶ 12. The court noted that Roy was a potential employer for both women, and "was in the position to either help or hinder them in their pursuit of their professional goals" and that he touched the women "in his capacity as a practicing physician, a position of trust." *Id.* The court found that there was sufficient evident that Roy employed "either compulsion or constraint to compel Annette and Jocelyn to submit" to the sexual contact.

{¶ 119} The third adult victim, Jolene, regularly visited Roy's family practice as a patient. On one instance, she said that while Dr. Roy listened to her heart, he set down his stethoscope and reached under her shirt and bra and fondled her breasts. "She stated she remained silent because she was scared and did not want to accuse a doctor of touching her inappropriately if she was misinterpreting the situation." *Id.* at ¶ 30. Jolene went back to Roy for another appointment, and he again squeezed her breasts in the same manner as before. Both times, Roy "did not tell her that he was going to touch her breasts or explain why it would be necessary for him to do so." *Id.* at ¶ 31.

{¶ 120} The *Roy* court found insufficient "force" to sustain the GSI conviction relating to Jolene because "[a]lthough she testified that Roy made her uncomfortable, she did not testify that she tried to pull away from him or vocalized her discomfort during the exams." *Id.* at ¶ 40. The court also stated that it felt constrained by the fact that R.C. 2907.05 does not explicitly "criminalize sexual contact based on any special position of trust that the offender may occupy," such as a physician. *Id.* at ¶ 44. We find several problems with this analysis.

46.

{¶ 121} First, in order to prove force, "a victim need not prove physical resistance to the offender." R.C. 2907.05(D). Nor is a victim required to "vocalize" their fear or duress. Whether a victim physically resists or vocalizes any fear is merely *probative* of force, but not *required* for a finding of force. *See, e.g.*, *State v. Stevens*, 3d Dist. No. 1-14-58, 2016-Ohio-446, ¶ 25, quoting *State v. Henry*, 3d Dist. Seneca No. 13-08-10, 2009-Ohio-3535 (Shaw, J., dissenting) (stating that the victim's resistance can be used "to infer any force or threat of force on the part of the defendant" and "the degree of force necessary for [the victim] to get away from [the defendant] is further indication of the degree of force being used by [the defendant] to perpetrate the offense.").

{¶ 122} Second, although we agree that the doctor-patient relationship does not create an inference of force, there is no question that "[t]he relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Roy.* at ¶ 35. Thus, the doctor-patient relationship is still a relevant factor to determine whether *any* amount of violence, compulsion, or constraint (or threat thereof) was sufficient to cause the victim "to submit" to sexual contact. And given the unique nature of the doctor-patient relationship, it is likely that a victim-patient will "submit" to sexual contact during a medical examination upon even the slightest amount of physical force, even though the same amount of force would be insufficient to cause a victim to submit within the context of a different relationship. "While an inappropriate touch would be cause for alarm if performed by an ordinary member of society, few would question the same touch if it occurred during a doctor's examination." *Id.* at ¶ 45. The law is clear: *any* amount of physical force or threat of physical force, however slight, is sufficient to

support a GSI conviction, and "force is a relative term, which depends on the totality of the circumstances in a given case." *Rupp,* 7th Dist. Mahoning No. 05MA166, 2007-Ohio-2837 at ¶ 49. We now turn to the two alleged victims in this case: M.S. and K.O.

{¶ 123} The state alleged that Heiney committed GSI against M.S. during her final appointment on February 12, 2015. M.S. alleged that Heiney fondled her breasts three times. First, he asked M.S. for permission to perform a "breast exam," ostensibly to see if the pain in her arm was somehow radiating from her breast, where she felt no pain. She agreed. Heiney then pulled the cup of her bra down, which completely exposed her breast, and he pushed and squeezed her breast with his bare hand. He later asked for her permission to examine her breast again, and then he "pushed on [her breast] a couple times." Finally, before giving M.S. an injection in her arm, Heiney pulled the cup of her bra away from her body, and placed a piece of gauze "deep inside [M.S.'s] bra under [her] breast" with his bare hand. No one was in the examination room at the time. Heiney was standing between M.S. and the door. M.S. testified that although she did not vocalize her distress or physically resist, Heiney's conduct made her feel "uncomfortable" and "embarrassed * * * angry [and] ashamed."

{¶ 124} We find that Heiney's repeated manipulation and movement of M.S.'s bra, while examining her in closed room without anyone else present, and while standing between M.S. and the door, is sufficient evidence of a physical "compulsion" or "constraint" that was separate and apart from the sexual contact itself. "Courts have found the element of force satisfied when the state presented evidence that the defendant manipulated or moved the victim's body or clothing* * *" *State v. Fouts*, 4th Dist.

48.

Washington No. 15CA25, 2016-Ohio-1104, ¶ 78 (Citing cases). The facts relating to M.S. are most analogous to patient "Annette" in *Roy*, where Roy pulled down Annette's bra, in a closed exam room, and fondled her breasts. *Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, at ¶ 10-13. Annette also similarly testified that "she never told Roy she was uncomfortable during the exam because he was a doctor and doctors are supposed to be trustworthy." *Id.* at ¶ 11. Moreover, this case is unlike "Patient C" in *Dew*, where the court noted that the use of fraud or deception to secure Patient C's consent to the unnecessary "vaginal adjustment" was, *by itself*, insufficient of force. *Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, ¶ 124. There, unlike here, the state merely argued that Dew exceeded the scope of consent; it did not advance a theory of *physical* force that was separate from the sexual conduct itself. *Id.* at ¶ 123. And, even if we assume that M.S.'s additional verbal consent to the two "breast exams" is somehow relevant to the analysis, Heiney did not ask for permission before he pulled her bra away and pushed a piece of gauze under her breast.

{¶ 125} Turning to K.O., during the examination in the closed room, Heiney directed her to take her arm out of her sleeve and bra strap. Heiney then held K.O.'s left arm with one of his hands and with his other hand, he pulled down her bra, exposed her breast and gave her a "breast exam." Later, while examining her low back, K.O. testified that Heiney "grabbed my pants and my underwear and pulled them down to right above my knees, and then started to feel around on my side and in my upper thigh region where his fingers kind of brushed against my private area."

49.

{¶ 126} Similar to M.S., we find that any rational trier of fact could have found that Heiney exercised some physical "compulsion" or "constraint" over K.O. by manipulating and removing articles of clothing—her bra, pants, and underwear—while in a closed room with no one else present. This physical manipulation of clothing required force, however minimal, beyond that inherent in the act of the sexual contact itself. Moreover, this minimal physical force was sufficient given the totality of the circumstances, including the nature of the parties' doctor-patient relationship.

{¶ 127} We therefore find Heiney's first assignment of error ("Error I") not well-taken.

### 6. Manifest Weight:  Gross Sexual Imposition

{¶ 128} In his second assignment of error, ("Error II") Heiney argues that his convictions for gross sexual imposition are against the manifest weight of the evidence.

{¶ 129} In support, Heiney emphasizes evidence that, he claims, establishes the medical necessity for the exams. For example, he asserts that he used the "least invasive treatment;" was "respectful;" asked his patients for permission before examining them; that he was "not alone with patients [and his] staff was welcome to come and go;" and that exam room doors were always unlocked.  He adds that none of the witnesses expressed discomfort during their respective examinations.

{¶ 130} Although such evidence was before the jury, we must extend special deference to the fact finder's credibility determinations, given that it is the fact finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy,

50.

equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury was free to choose which witnesses to credit and how to interpret the evidence before it. None of the arguments advanced by Heiney undermine the jury's ultimate conclusion that the state proved all of the elements of gross sexual imposition against M.S. and K.O. beyond a reasonable doubt.

{¶ 131} In addition, while Heiney also argues that the verdict was against the manifest weight because Evid.R. 404(B) testimony was allowed "for murky reasons" and Foetisch should not have been allowed to testify as an expert, we have already addressed and rejected those arguments above. Heiney's second assignment of error is not well-taken.

### 7. Jury Instruction on "Force or Threat of Force"

{¶ 132} In his eleventh assignment of error ("Error XI"), Heiney alleges that the trial court erred in instructing the jury on the issue of "force or threat of force." Heiney argues that the jury instruction improperly allowed the jury to "imply that there was psychological 'pressure' created by the doctor-patient relationship and this could be interpreted to be 'force' by 'compulsion.'"

{¶ 133} A trial court is "obligated to provide jury instructions that correctly and completely state the law" when those instructions are "warranted by the evidence presented in a case." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22. While we afford trial courts "broad discretion to decide how to fashion jury instructions," we still require courts to "'give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and

51.

discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. While an appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion, an appellate court applies a de novo review to determine whether a disputed jury instruction correctly stated the applicable law. *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 30; *Cromer* at ¶ 22 ("The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.").

{¶ 134} The trial gave the following instruction on "force":

Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. A victim need not prove physical resistance to prove force. As long as the state shows that the defendant overcame the victim's will by fear or duress, it has established the force element. Psychological pressure – the force need not be overt or physically brutal. *Subtle or psychological pressure that causes a victim to be overcome by fear or duress constitutes force*. * * * Dr./Patient relationship – while the doctor-patient relationship does not create an inference of force, you may consider such relationship between the parties as a relevant factor in determining whether the victim's will was overcome by fear or duress. The sufficiency of force depends upon the totality of the circumstances including the medical professional/patient relationship. (Emphasis added.)

{¶ 135} As we have already discussed at length above, the italicized statement regarding the adequacy of mere "subtle or psychological pressure" as sufficient "force" is the so-called "*Eskridge* rule," which has been applied to sexual abuse cases involving a defendant with parental or similar authority over a child, and has been extended to situations involving closely-analogous relationships between an authority figure and victim. *See, e.g. State v. Stober,* 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, ¶ 37-39 (coach/teacher and student); *Fortson,* 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, ¶ 86 (correctional officer and female inmate); *Oddi,* 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926, ¶ 57 (driving instructor and student). As established by the Supreme Court of Ohio in *Schaim*, there must be some physical force, or threat of physical force, apart from the sexual contact. *Schaim,* 65 Ohio St.3d at paragraph one of syllabus, 600 N.E.2d 661. Because this case does not concern a parent-child or similar relationship of authority, the trial court's inclusion of the one sentence encompassing the "*Eskridge* rule" was error.

{¶ 136} Where there are errors within a jury instruction, "a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *Kokitka v. Ford Motor Co.,* 73 Ohio St.3d 89, 93, 642 N.E.2d 671 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.,* 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

{¶ 137} We find it unlikely that the trial court's inclusion of one sentence encompassing the inapplicable "*Eskridge* rule" misled the jury in a manner affecting

53.

Heiney's substantial rights. The remainder of the disputed jury instruction correctly and accurately states the applicable law as applied to the facts of this case, which we discussed at length when considering the sufficiency of the evidence supporting "force or threat of force." Most importantly, the trial court correctly stated that "the doctor-patient relationship does not create an inference of force," but that it is "a relevant factor in determining whether the victim's will was overcome by fear or duress."

{¶ 138} Moreover, it is unlikely that the jury relied upon the inapplicable sentence to find *non*-physical force, alone, supported the GSI convictions because the state correctly argued the presence of *physical* force. In its closing, the state argued:

> So what evidence of force has been presented to you throughout the course of this trial? Let's start with [M.S.] It is true that Jake Heiney asked for her permission before he palpated her breast tissue and gave her that breast exam. * * * Jake Heiney did not, however, ask for her permission when he pulled her bra away from her breasts and shoved that gauze into the cup of her bra with no gloves on. With no one else in the room, Dr. Heiney positioned between her and the door, and that door closed. He pulled her bra away, he exposed her breasts, and he placed that gauze underneath her breast while commenting on her white bra. It was subtle, it was slight, but it was force. She trusted him.

> So what about [K.O.]? What evidence of force was presented in [her] case? Here it's much more obvious. Dr. Heiney never asked for her permission before he touched her breasts. He just pulled down her bra and

felt her up three separate times. And when she was bent over touching her toes and he yanked down her pants and her underwear, he didn't ask for her permission. He didn't warn her. He didn't tell her why he was doing it. He just did it.

{¶ 139} Thus, because the remainder of the jury instruction was legally correct and applicable to the facts, and because the state properly argued that *physical* force supported the GSI convictions, we find that the trial court's inclusion of the one sentence relating to the inapplicable "*Eskridge* rule" was harmless error. Accordingly, the eleventh assignment of error (Error XI) is not well-taken.

## 8. The Admissibility of Audiotaped Interview

{¶ 140} Heiney's third assignment of error ("Error III") concerns his audiotaped interview by investigators Bliss and Yoakham from the State Medical Board of Ohio. Heiney claims that the trial court erred when it allowed the audiotaped interview to be played for the jury because (1) Heiney's own statements were inadmissible hearsay given that he "said nothing against his interest," (2) Yoakham improperly commented on Heiney's veracity, and (3) the admission of Yoakham's recorded comments violated his right to confront Yoakham as an adverse witness.

{¶ 141} First, Heiney did not object to the admission of his *own* recorded statements into evidence. Instead, Heiney's trial counsel affirmatively stated that "there's just a couple parts of the transcript that are in issue," and then proceeded to object to only those portions of the transcript that contained Yoakham's statements. Accordingly, we must review the trial court's admission of Heiney's own statements for plain error. *State*

55.

*v. Jackson*, 92 Ohio St.3d 436, 438, 751 N.E.2d 946 (2001). An error "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 142} It is well established that an out-of-court admission by a party is an express exception to the hearsay rule. Under Evid.R. 801(D)(2)(a), "[a] statement is not hearsay if * * * "[t]he statement is offered against a party and is * * * the party's own statement." *See e.g. State v. Edwards,* 11th Dist. Lake No. 2012-L-034, 2013-Ohio-1290, ¶ 33. Moreover, Evid.R. 801(D)(2)(a) does not require the statement to be introduced contradict the defendant's position. *State v. Johnson,* 12th Dist. Butler No. CA2002-04-100, 2003-Ohio-2540, ¶ 20-22. "Rather, it only requires that the statement be offered against [his] interest, in support of the state's case." *Id.* The trial court did not err by allowing the state to play Heiney's own recorded statements for the jury.

{¶ 143} Heiney also argues that the trial court erred when it allowed the jury, over his objection, to hear two separate comments by Yoakham: (1) "[t]his is [Myers'] investigation. I'm just an (inaudible) * * * I gotta be honest with you. * * * There [are] some questions that she asked you that your body language gave me concern about."; (2) "I think there's some aspect of this interview where you were honest, and I think there are aspects where you were not completely honest with us." Heiney argues that Yoakham improperly commented on Heiney's credibility.

{¶ 144} Heiney is generally correct that "[a] police officer's opinion that an accused is being untruthful is inadmissible." *State v. Davis*, 116 Ohio St.3d 404, 2008-56.

Ohio-2, 880 N.E.2d 31, ¶ 122.  Following *Davis,* courts have recognized the likelihood that a jury will be unduly influenced by a police officer's opinion regarding the credibility of a witness.  *State v. Withrow,* 11th Dist. Ashtabula No. 2011-A-0067, 2012-Ohio-4887, ¶ 47.  Thus, an officer's statements that a defendant was being "deceptive" or "untruthful" are improper.  *State v. Carpenter*, 12th Dist. Clermont No. CA2012-06-041, 2013-Ohio-1385, ¶ 23 (the trial court erred by admitting statements that "there was some deception" by the defendant and that the detective "was not getting the complete truth.").  On the other hand, an officer's observations regarding a defendant's "demeanor" are not improper.  *Id.*  (finding statements that the defendant "appeared to be very nervous" and "guarded" during his interview "was simply a comment about [defendant's] demeanor.")

{¶ 145} With regard to Yoakham's first comment—i.e., that Heiney's "body language" gave him some "concern"—we find that the comment was simply an observation about Heiney's demeanor and was not a comment on Heiney's veracity.  The trial court did not err when it allowed this statement to be heard by the jury.

{¶ 146} Yoakham's second comment—i.e., that Heiney was not being "completely honest"—is, however, problematic because it expresses Yoakham's opinion that Heiney was not being truthful.  The trial court should not have allowed the jury to hear that comment.

{¶ 147} We find, however, that this was harmless error because there is no reasonable possibility that this single comment contributed to Heiney's conviction.  *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 28 (an error is harmless only when "there is no reasonable possibility that the testimony contributed to

57.

the accused's conviction."). As discussed within the context of the other assignments of error, there was overwhelming evidence of Heiney's guilt. *See Ohio v. Kidder,* 32 Ohio St.3d 279, 283-284, 513 N.E.2d 311 (1987) (although the trial court should have redacted the sheriff's comment to the defendant that "you're not telling the truth" during an audiotaped custodial interrogation that was presented to the jury, "[i]n this context, the impact on the average jury would have been much less than the same statements made by a police officer on the witness stand at trial. Thus, in light of the overwhelming evidence presented on all the charged crimes, the error in not excising certain portions of the transcript was not so prejudicial as to require reversal."). Moreover, the trial court gave the following jury instruction, and we may presume that the jury followed the instruction:

> No witness may testify to an opinion about the truthfulness of the testimony of another witness. It is solely up to you as the jury to decide, from the evidence, whether you believe the testimony of each of the witnesses who appeared before you. Thus, as you consider the interviews of Dr. Heiney, you are to disregard any statements made by Amy Myers, Chad Yokum [sp], and Laura Bliss about the credibility of others, i.e. Dr. Heiney.

**{¶ 148}** Finally, Heiney argues that because Yoakham did not testify, use of his recorded statements—which were Yoakham's observations regarding Heiney's statements to the SMBO investigators—was a violation of his right to confront adverse witnesses as stated in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed 177 (2004). Under *Crawford*, the Confrontation Clause bars "testimonial statements of

58.

a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Id.* at 53-54. *Crawford*, however, does not apply to Yoakham's testimony about *Heiney's* statements because Heiney is the accused. *Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 127; *Carpenter,* 12th Dist. Clermont No. CA2012-06-041, 2013-Ohio-1385, at ¶ 27.

**{¶ 149}** For all these reasons, Heiney's third assignment of error is not well-taken.

### 9. The Testimony of Detective Bliss

**{¶ 150}** In his tenth assignment of error ("Error X"), Heiney argues that Detective Bliss (1) offered improper expert testimony, (2) improperly vouched for the credibility of K.O. and M.S., and (3) offered inadmissible hearsay statements into evidence.

**{¶ 151}** Heiney argues that Detective Bliss offered improper expert testimony in two respects: Detective Bliss purportedly testified as an expert "about orthopedic care," and improperly testified as an expert when she testified that it was not "abnormal" that K.O. omitted a significant detail from her initial report to the Sylvania police.

**{¶ 152}** We find that Detective Bliss did not testify as an expert in "orthopedic care." Indeed, she did not testify about "orthopedic care" at all. Bliss merely testified that, as part of her investigation, she consulted with ten medical professionals, including three orthopedic surgeons, for the purpose of understanding "standard exam procedures." Detective Bliss did not offer any substantive testimony regarding "orthopedic care."

**{¶ 153}** Detective Bliss did, however, provide some expert testimony when she testified that, based on her 19 years of experience investigating sexual assault cases, it

59.

was not "abnormal" that K.O. had omitted an important detail (i.e., that Heiney's fingers rubbed against her vagina) from her initial police report.   Detective Bliss explained that "[i]t's actually very commonplace" given that only 24 hours had elapsed between the incident and the time K.O. reported the incident to the police.  She then started to testify that "when someone is victimized, they go through a process," but was cut off after Heiney's counsel made an objection, which was sustained.

{¶ 154} This particular testimony is properly categorized as expert testimony because it required specialized knowledge beyond the knowledge of the average juror. *State v. Solether,* 6th Dist. Wood No. WD-07-053, 2008-Ohio-4738.  In *Solether,* a police detective, who had investigated 150-200 sexual assault cases, testified that, based on his training and experience, it is not unusual for rape victims to delay reporting the rape.  We found that that the officer's testimony required "specialized knowledge," and was therefore "properly categorized as expert testimony" under Evid.R. 702.  *Id.* at ¶ 65.  And while the state did not specifically ask that the officer be deemed an expert by the court, we concluded that his professional experience and training provided him with a sufficient degree of specialized knowledge to provide such testimony.  *Id.* at ¶ 68-69.  *Accord, State v. McIntire,* 6th Dist. Huron No. H-13-018, 2015-Ohio-1057, ¶ 17.

{¶ 155} Here, we find that Detective Bliss offered very brief and very limited expert testimony when she testified that, in her experience, it was not "abnormal" that K.O. omitted a significant detail from her police report.  And, as in *Solether* and *McIntire,* we find that Detective Bliss's professional training and experience provided her with a sufficient amount of specialized knowledge to provide such testimony.

{¶ 156} Heiney also argues that Detective Bliss improperly vouched for the credibility of M.S. and K.O. when, over Heiney's objection, she testified that she had interviewed various people whom M.S. and K.O. had separately "confided in" and none of those people contradicted what M.S. and K.O. had said during their own interviews.

{¶ 157} Heiney is generally correct that a witness "may not provide opinion testimony regarding the truth of a witness's statements or testimony." *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 72, quoting *State v. Stowers*, 81 Ohio St.3d 260, 262, 690 N.E.2d 881 (1998); *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990). But here, Detective Bliss did not explicitly testify that the victims were being truthful; she merely testified that they were being consistent. Importantly, she did not elaborate any further beyond that. We find that the trial court did not abuse its discretion in overruling Heiney's objections to this limited testimony.

{¶ 158} Finally, Heiney also complains that Bliss was allowed to testify, over his objection on hearsay grounds, as to what Carla Smith told her about how medical records were maintained at Heiney's office. Although this was hearsay, its admission was harmless error because it was cumulative of Smith's own trial testimony. *State v. Noles*, 6th Dist. Lucas No. L-12-1310, 2013-Ohio-4088, ¶ 42, quoting *State v. Tomlinson*, 33 Ohio App.3d 278, 281, 515 N.E.2d 963 (12th Dist.1986).

{¶ 159} Heiney's tenth assignment of error is not well-taken.

### 10. Cumulative Error

{¶ 160} In his eighth assignment of error ("Error VIII"), Heiney claims that "various evidentiary rulings * * * cumulatively deprived" him of a fair trial. The

cumulative error doctrine provides that, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. "[I]n order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed in this case." *State v. Wright*, 6th Dist. Lucas No. L-12-1327, 2013-Ohio-5910, ¶ 31 citing *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000)

{¶ 161} Heiney claims seven unfavorable evidentiary rulings by the trial court "reflected a bias against Heiney's trial counsel that impacted the trial court's decision making process." A trial court's ruling on evidentiary issues will not be reversed "absent an abuse of discretion and proof of material prejudice." *State v. McKelton,* 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181.

{¶ 162} First, Heiney argues that Investigator Myers "was permitted to opine that Heiney did not properly maintain his office's medical records [according to] the 'American Medical and Ohio Medical Association protocols.'" Heiney claims that the state failed to lay a proper foundation as to the content of the protocols and that Myers was not competent to testify as an expert as to their content. Because Heiney's trial counsel did not object to this testimony, we must review for plain error. *State v. Willett,* 4th Dist. Ross No. 11CA3260, 2012-Ohio-2186, ¶ 19. We find no error. The allegedly

62.

improper testimony was elicited on redirect, after Heiney's counsel cross-examined Myers regarding her own knowledge of the AMA's preferred protocols regarding a physician's duty to keep and update records. Heiney opened the door to this line of questioning, which Myers provided as a lay witness based on her own knowledge and experience.

{¶ 163} Second, Heiney argues that, "Myers was allowed to testify [that] Carla Smith* * *was 'shocked' to find out that Heiney did not label the [K.O.] change as an 'addendum.'" But, as soon as Heiney's counsel objected to this testimony, the prosecutor withdrew the entire question and rephrased it "to stay away from specific conversations that Carla had with [Myers.]" Again, there was no error.

{¶ 164} Third, Heiney argues that the trial judge displayed judicial bias against his trial counsel during the state's direct examination of Jennifer Downard, the administrative assistant who altered K.O.'s medical records (at Heiney's instruction). During the examination, defense counsel objected five times. After the first objection was overruled, defense counsel was allowed to approach the bench and make a proffer for the record. Questioning continued, and defense counsel objected four more times in short succession. Defense counsel made the final objection by saying, "Objection. Objection. Objection" which the court overruled, without comment. Counsel then asked to approach the bench, again, to make another proffer. The court said, "[s]tay seated. You can put it on the record afterwards. I've ruled on your objection." Moments later, at the completion of Downard's testimony, defense counsel again asked about making the proffer. The court

63.

responded, "[Counselor], enough.  Okay.  We are calling the [next] witnesses.  We'll deal with it later.  Your outbursts in front of this jury are not acceptable.  All right."

{¶ 165} R.C. 2945.03 charges a trial judge with the duty of controlling "all proceedings during a criminal trial," * * * [including] the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue."  In exercising this duty, "the judge must be cognizant of the effect of his comments upon the jury." *State v. Wade*, 53 Ohio St.2d 182, 187, 373 N.E.2d 1244 (1978), *reversed on other grounds Wade v. Ohio*, 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed. 2d 1157 (1978).  "In determining whether a trial judge's remarks were prejudicial, the courts adhere to the following rules:  (1) the burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel." *Wade* at 188; *see also State v. Thomas,* 6th Dist. Wood No. WD-06-014, 2007-Ohio-3466, ¶ 61.

{¶ 166} We find the trial court's remarks, while firm, were not inappropriate. Taken in context, its pointed comment ("[y]our outbursts * * * are not acceptable") was in response to defense counsel asking for multiple bench conferences on the same issue, which the court had just indicated would be dealt with "later." Also, the court did not "deny" counsel the right to make a proffer, as alleged.  Instead, it postponed it until

64.

"later," which, in its estimation, was preferable to making the jury sit through another extended side bar conversation and was within the court's authority under R.C. 2945.03.

{¶ 167} Fourth, Heiney claims that two witnesses, M.S. and C.G., were allowed to testify, "over trial counsel's objections," about statements by their respective physicians. We disagree—in both instances, Heiney's objections *were sustained*, so no error occurred.

{¶ 168} Fifth, Heiney claims that the trial court erred in allowing the state to inquire about what "long term effects" Heiney's actions had on M.S. Heiney objected on the basis that the question was irrelevant, and the objection was overruled. M.S. was then allowed to testify that she is less trusting, of herself and others, as a result of Heiney's conduct. On appeal, Heiney argues that M.S.'s testimony amounts to an improper "victim impact statement" and that its real purpose was "to inflame the jury."

{¶ 169} Victim impact evidence is generally inadmissible during the guilt phase of a trial because it is irrelevant and immaterial to the guilt or innocence of the accused and also because it principally serves to inflame the passion of the jury. *State v. White*, 15 Ohio St.2d 146, 239 N.E.2d 65 (1968). Victim-impact evidence is admissible, however, when it is related to the facts attendant to the offense. *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995). We find that M.S.'s testimony was relevant to show that she sustained a psychological injury, i.e. Heiney's conduct negatively impacted her ability to trust, and as such, it was not improper to allow it. *State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 81 (Gunshot victim's testimony that she underwent surgery, was in a coma, and was receiving physical therapy was relevant

to show "nature and extent of her injuries."). *See also State v. Eads,* 8th Dist. Cuyahoga No. 87636, 2007-Ohio-539, ¶ 56 ("The emotional scars of sexual abuse are as real as the physical scars caused by physical assaults. Just as the victim of a felonious assault may testify to the treatment needed as a result of the assault in order to prove that the assault actually did occur, so may the victim of a sexual assault testify to the lingering trauma suffered as a result of that abuse."). We find that the trial court did not abuse its discretion in allowing M.S. to testify about the effect of Heiney's conduct.

{¶ 170} Sixth, Heiney argues that the trial court unfairly limited his right to cross-examine Dr. Foetisch and L.G. As discussed, we find no error in the trial court's rulings regarding the cross-examination of Dr. Foetisch ("Error VI") or L.G ("Error VII").

{¶ 171} The seventh and final error claimed by Heiney occurred during his cross-examination of Detective Bliss. Heiney's counsel asked whether there was "anything that you have not turned over to us in discovery?" The state objected on the basis that it was the prosecutor's office, not the police, who were charged with producing discoverable materials, and it asserted that it had made full discovery in this case. Defense counsel argued in favor of being allowed "to explore" whether the detective had any more "documents, records, or anything else" in her possession that she had used during her investigation but that the prosecutors did not have. The court sustained the state's objection, which Heiney claims was error.

{¶ 172} In our review of the transcript, we note that, despite the trial court's ruling, defense counsel asked the detective *four more times* variations of the same question, i.e. whether she had "turned over everything you have done to the prosecutor's

66.

office, and that's all been provided in discovery; correct?" The state did not object to any, and the detective answered "yes" each time. The detective also admitted that her report did not make reference to all of the professionals she spoke to in determining whether charges should be brought against Heiney. Thus, even if the trial court did err in sustaining the state's objection, it was, at most, harmless error because defense counsel was able to elicit the very testimony it sought.

{¶ 173} Heiney's eighth assignment of error is not well-taken.

### 11. The Constitutionality of Heiney's Sex Offender Classification

{¶ 174} Finally, we address Heiney's ninth assignment of error ("Error IX") in which he argues that his mandatory Tier I sex offender classification under R.C. Chapter 2950 is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. R.C. Chapter 2950 is, in fact, subject to scrutiny under the Eighth Amendment because the Supreme Court of Ohio has determined that the sex offender registration requirements under R.C. Chapter 2950 are punitive, not remedial. *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, ¶ 15.

{¶ 175} Heiney, however, did not object in the trial court to the constitutionality of applying the mandatory Tier I sex offender classification to him. Heiney has therefore forfeited his constitutional challenge to the application of the sex-offender requirements set forth in R.C. Chapter 2950 to him. *State v. Golson*, 8th Dist. Cuyahoga No. 104776, 2017-Ohio-4438, ¶ 11. We will nonetheless exercise our discretion to consider the forfeited constitutional challenge under a plain error analysis. *Id.* at ¶ 12.

67.

{¶ 176} Heiney is not arguing that R.C. Chapter 2950 is unconstitutional on its face but, rather, that "the application of the statute in the particular context in which he has acted* * * [is] unconstitutional." *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 17, quoting *Ada v. Guam Soc. Of Obstetricians and Gynecologists*, 506 U.S. 1011, 113 S.Ct. 633, 121 L. Ed.2d 564 (1992) (Scalia, J., dissenting). To determine the as-applied constitutionality of the statute, we must consider "(1) the culpability of the offender in light of his crime and characteristics; (2) the severity of the punishment in question; and (3) the penological justification." *State v. Blankenship*, 145 Ohio St.3d 221, 2015-Ohio-4624, 48 N.E.3d 516, ¶ 22, citing *Graham v. Florida*, 560 U.S. 48, 67, 130 S.Ct. 2011, 176 L.Ed 825 (2010).

{¶ 177} First, regarding culpability, Heiney's conviction for gross sexual imposition makes him an automatic "Tier I sex offender" under the governing statute, R.C. 2950.01(E)(1)(c). As the Supreme Court of Ohio recognized in *Blankenship*, "the legislature has chosen to draw the line" by recognizing the unique culpability of adults who commit certain "sexually oriented offenses," including gross sexual imposition, and such individuals are therefore "deemed more culpable and more deserving of punishment." *Id.* at ¶ 24.

{¶ 178} Second, regarding the severity of Heiney's 15-year registration requirement as a Tier I sex offender under R.C. 2950.07(B)(3), we note that Heiney's registration period is much shorter than the 25-year registration requirement of a Tier II sex offender, which was determined to be constitutional in *Blankenship*. *Id.* at ¶ 38 (finding that the 25-year registration requirement "do[es] not meet the high burden of

68.

being so extreme as to be grossly disproportionate to the crime or shocking to a reasonable person.") "Since the Court in *Blankenship* determined that a registration period that is nearly twice as long as the one imposed here is permissible under the Eighth Amendment, we can discern no reason to conclude that [Heiney's] 15-year registration period is so severe as to reach the level of unconstitutionality." *State v. Conley*, 9th Dist. Summit No. 27869, 2016-Ohio-5310, ¶ 13 (rejecting an as-applied constitutional challenge to Tier I registration requirements). Also, although Heiney argues that the punishment was severe as applied to him because he can no longer practice medicine, Heiney's loss of his medical license is a collateral consequence of the convictions themselves. *See Lefkowitz v. Fair*, 816 F.2d 17, 20 (1st Cir.1987).

{¶ 179} Finally, regarding the "penological justification" for the sex offender registration requirements, "registration [is] a more economical method of monitoring and preventing recidivism than the costly alternative of imprisonment." *Blankenship* at ¶ 30. We also note that although Heiney argues that he "was determined to [be] at a low risk of reoffending," we have not located any such "determination" in the record.

{¶ 180} We therefore find Heiney's ninth assignment of error not well-taken.

### Conclusion

{¶ 181} Having found none of Heiney's 11 assignments of error to be meritorious, we affirm the February 29, 2016 judgment of the trial court in full. Heiney is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

Thomas J. Osowik, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.